STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| IN RE: | Case No. 13-50844-btb<br>(Chapter 11) |
| THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company, | **DEBTOR'S OMNIBUS REPLY TO SECURED CREDITORS' OBJECTIONS TO DEBTOR'S DISCLOSURE STATEMENT** |
| Debtor. | |
| | Hrg. Date:    September 12, 2013<br>Hrg. Time:    10:00 a.m. |
| _____/ | |

THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company ("Debtor" or "Sharkey's") by and through its counsel, STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, hereby files its **DEBTOR'S OMNIBUS REPLY TO SECURED CREDITORS' OBJECTIONS TO DEBTOR'S DISCLOSURE STATEMENT** ("Reply") to NEVADA STATE BANK'S OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT [Docket No. 70], OBJECTION OF SEE HORSE 1, LLC, TO DEBTOR'S DISCLOSURE STATEMENT [Docket No. 72], and CITY NATIONAL BANK'S OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT [Docket No. 74] (collectively the "Objections"), and alleges states as follows:

1.    The Debtor has prepared its DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT ("Amended Disclosure Statement"), a copy of which is attached hereto as Exhibit A and incorporated herein by that reference, which addresses most of the issues raised in the Objections.  Specifically, the Amended Disclosure Statement provides for the secured creditors' recovery of reasonable attorneys' fees and costs, clarification of the use of the term "Sharkey's Casino", disclosure of insider/affiliate claims, and additional information regarding other entities owned by the Holder Group, LLC.

2.    More importantly, the Amended Disclosure Statement also includes updated projections of income and expenses, along with addressing concerns raised in the Objections as to future cash flows and the ability of the Debtor to maintain payments under the proposed Plan of Reorganization, as it may be amended.

3.    The Objections all raise the issue of cash flow deficits based upon the Monthly Operating Reports filed by the Debtor since the Petition Date.  It should be noted that the Monthly Operating Reports filed to date do not reflect actual "operating income" as is customarily defined, and have included in the monthly expenses since the Petition Date (May, June, and July) approximately $42,000.00 of depreciation expense, $66,000.00 of management fees, and also include the monthly adequate protection payments paid to the secured creditors of approximately $94,000.00.  As stated in the Amended Disclosure Statement, CMS International, the management service provider for the Debtor, has agreed to waive its fee for most of September 2013, and continuing through July, 2014, and will only request a fee to be paid if the Debtor has sufficient cash flow available to pay all Plan payments.  This savings of at least $24,000.00 per month, coupled with the fact that the Monthly Operating Report reflects non-cash depreciation, gives the Debtor more than sufficient cash flow to cover the payments contemplated under the Plan.

Based upon the foregoing, Debtor renews its request for approval of its Debtor's First Amended Disclosure Statement, pursuant to 11 U.S.C. 1124, as containing adequate information.

DATED this 5th day of September, 2013.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC

*/s/ Stephen R. Harris*
_____
Attorneys for Debtor

# EXHIBIT "A"

# EXHIBIT "A"

STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| IN RE: | Case No. 13-50844-btb |
| THE HOLDER GROUP SHARKEY'S, LLC | (Chapter 11) |
| a Nevada limited liability company | |
| | Hearing Date: September 12, 2013 |
| Debtor. | Hearing Time: 10:00 a.m. |

_____/

## DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

Dated:          SEPTEMBER 5, 2013

Filed by:       STEPHEN R. HARRIS, ESQ.
                HARRIS LAW PRACTICE LLC
                6151 Lakeside Drive, Suite 2100
                Reno, Nevada 89511
                Telephone: (775) 786-7600

                Attorneys for THE HOLDER GROUP SHARKEY'S, LLC,
                a Nevada limited liability company

## I. INTRODUCTION

THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company, Debtor and Debtor-in-Possession ("Debtor") in the above-captioned Chapter 11 case, provides herewith the information contained in this DEBTOR'S FIRST AMENDED DISCLOSURE

STATEMENT ("DISCLOSURE STATEMENT") to all known creditors and other parties in interest of the Debtor in order to disclose that information deemed material, important, and necessary to the creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of the Plan of Reorganization.

Together with this DISCLOSURE STATEMENT, each creditor should also have received a copy of DEBTOR'S PLAN OF REORGANIZATION to be amended consistent with the Debtors First Amended Disclosure Statement ("PLAN"), a form Ballot on which creditors and other parties in interest who are entitled to vote may cast their respective vote, and a copy of the ORDER APPROVING DEBTOR'S DISCLOSURE STATEMENT which indicates that the Bankruptcy Court has approved this DISCLOSURE STATEMENT for circulation to creditors in that it contains information of a kind and of sufficient detail, as far as its reasonably practicable, to enable creditors and other parties in interest to make an informed decision about the PLAN. As indicated in the Instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the PLAN, the Ballot must be mailed to Debtor's counsel in time to insure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

You are urged to carefully read this DISCLOSURE STATEMENT and the DEBTOR'S PLAN OF REORGANIZATION before deciding to accept or reject the PLAN. Particular attention should be directed to the provisions of the PLAN affecting your rights as well as the Liquidation Analysis which describes the results which would be obtained in the event the Debtor's business is discontinued and its assets liquidated.

## II. THE CHAPTER 11 CONFIRMATION PROCESS

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the DEBTOR'S PLAN OF REORGANIZATION must be accepted by at least one Class of Creditors whose claims against the Debtor will be "impaired" under the PLAN. Claimants who are scheduled to receive full payment on their Claims are deemed to have accepted the PLAN and do not vote. Only Creditors whose Claims are "impaired" are entitled to vote in favor of accepting or rejecting the PLAN. A Class of

claims is "impaired" if the amount to be paid to the Class provides the Claimants in that Class with less than full payment of the Allowed Claims in that Class or a different interest rate, or the terms for repayment are extended beyond the contractual due date. Acceptance by such Class requires that at least one-half of the Creditors in the Class who cast accepting votes on the PLAN, and hold at least two-thirds of the total dollar amount of the Claims in that Class casting votes on the PLAN.

### III. DISCLAIMER

NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR VALUE OF PROPERTY, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OF REORGANIZATION WHICH ARE NOT CONTAINED HEREIN OR IN THE PLAN OF REORGANIZATION SHOULD NOT BE RELIED ON BY ANY CREDITOR OR OTHER PARTY IN INTEREST. ALTHOUGH THE FINANCIAL INFORMATION CONTAINED HEREIN IS BELIEVED TO BE ACCURATE, IT HAS NOT BEEN SUBJECTED TO ANY CERTIFIED AUDIT AND IS NOT WARRANTED OR REPRESENTED TO BE ERROR FREE.

### IV. DEBTOR'S FINANCIAL HISTORY AND EVENTS LEADING TO CHAPTER 11 FILING

THE HOLDER GROUP SHARKEY'S, LLC, at Nevada limited liability company, was formed on July 17, 2001. The owner of a 100% membership interest in the Debtor is The Holder Group, LLC, a Nevada limited liability company ("Holder Group"). Harold D. Holder, Sr. is the manager of both the Debtor and its principal. Harold D. Holder, Sr., is also the sole member of Holder Group. The Holder Group is the principal in several gaming related limited liability companies, including The Holder Hospitality Group, Inc, The Holder Group Sundance, LLC, Holder Group Vending Company, LLC, The Holder Group Hawthorne, LLC, and CMS International. Holder Group is also the owner of Silver Club, Parker's Model T, Inc., the

1    Holder Group El Capitan, Inc., and The Holder Group Elko, LLC, which were jointly
2    administered Debtors in Case Number 09-51953-GWZ in the United States Bankruptcy Court.
3    That case has since been dismissed, but the entities are still-existing.

4         On or about December 10, 2001, the Debtor acquired the Sharkey's Casino in
5    Gardnerville, Nevada, which consisted of 10 parcels of improved and unimproved real property
6    (APN1320-33-401-22, 1320-33-401-29 thru 33 and 1320-33-401-15 thru 18) on which the
7    Sharkey's Casino was built. The Debtor maintains a fictitious firm name filing with Douglas
8    County as Sharkey's Casino, and the casino operation is referred to herein as "Sharkey's
9    Casino". The casino was acquired from Milos S. Begovich, who had also acquired title as
10   Milos Sharkey Begovich, and the casino had been for sale for 3 years prior to purchase by the
11   Debtor. The Debtor took possession and control of operations of the Casino on January 1, 2002.
12   The Debtor paid a total of $5,000,000.00 for the Casino and the 9 properties surrounding it. In
13   August of 2006, Debtor divested itself of APN 1320-33-401-22. Currently, the Debtor owns 7
14   parcels of improved real property on which the casino is located and 2 parcels used for
15   additional parking.

16        During the first five months of ownership, the Debtor remodeled the casino and sold
17   approximately $800,000.00 of memorabilia, the sale of which paid for the initial remodel. The
18   casino has been remodeled twice more since that time.

19        At the time of the purchase of the Casino, the Debtor entered into 3 unsecured
20   promissory notes with Milos Sharkey Begovich in the combined amount of $3,000,000 payable
21   at an interest rate of 0% and with a maturity date of February 1, 2016. In 2011, Debtor had been
22   paying Begovich a total of $16,649.00 per month on the three notes, but ceased making
23   payments on the Begovich notes in September, 2011. The Begovich note is disputed by the
24   Debtor and subject to pending litigation, although the Debtor now proposes allowance of the
25   Begovich Note in the amount of $700,000.00, payable at zero interest, with monthly payments
26   based on a thirty (30) year amortization schedule. Also in December of 2001, the Debtor
27   originated a line of credit with Northern Nevada Bank with an original credit limit of
28   $1,500,000.00.

In April of 2004, the Debtor entered into a loan agreement with Great Basin Bank in the amount of $2,000,000.00. Northern Nevada Bank reconveyed its deed of trust secured on the Debtor's seven (7) real property parcels in order to allow the Great Basin Bank loan to assume a first priority position, and then on May 18, 2004, recorded a new deed of trust and security agreement for the line of credit. At the time the new line of credit was issued, the available credit limit was $2,200,000.00. Through a series of modifications, the credit limit was ultimately increased to $4,000,000.00.

The Debtor also entered into secured loan agreements with Business Bank of Nevada that were secured on the two "stand alone" parcels. Each of those loans was in the original principal amount of $150,000.00.

Northern Nevada Bank was the subject of closure by the Federal Deposit Insurance Company ("FDIC") and Nevada Security Bank became the successor in interest. Subsequently, Nevada Security Bank also was subject to closure by the FDIC, and Umpqua Bank became the successor in interest to the line of credit. In November of 2012, Umpqua Bank sold the obligation owed it by the Debtor to See Horse 1, LLC. See Horse 1, LLC is owned by Michael Pegram, and is associated with The Carson Valley Inn, the primary competitor of the Debtor in the Minden/Gardnerville area. Great Basin Bank was also closed by the FDIC and Nevada State Bank became the successor in interest of the Debtor's obligation to Great Basin Bank. Business Bank of Nevada was also closed by the FDIC, with City National Bank becoming the successor in interest as to the Debtor's obligation to Business Bank of Nevada. The Debtor also disputes the note held by See Horse 1, LLC.

When Debtor purchased the casino from Begovich, it paid 70 times EBITDA for the casino and its related real property, which was a high ratio for a casino not located in Las Vegas. For the first several years, the casino was profitable and able to maintain debt service. However, in 2010, as a result of the ongoing slump in the economy and the continued competition from Indian gaming in California, its EBITDA dropped from $1,120,260 to for the year to $638,150. While the income levels increased in 2011 and in 2012, they still did not reach the levels maintained in 2009. It is anticipated that income levels for 2013 will come

close to the 2009 figures.

Because the Debtor ceased payments to See Horse 1, LLC shortly after See Horse 1 purchased the Debtor's loan from Umpqua Bank, See Horse 1, LLC commenced efforts to foreclose on its real property collateral. The instant Chapter 11 case was filed to stay the foreclosure sale.

## V. DESCRIPTION AND VALUATION OF ASSETS

The Debtor's assets which existed on the Petition Date are described as follows:

| Description | Est. Market Value |
| --- | --- |
| Real Property | $8,706,000.00 |
| Bank of America general account | $14,668.51 |
| Cash (restricted and unrestricted) | $66,095.19 |
| Accounts Receivable ($656,444.38 of which $550,000 is uncollectible) | $106,444.48 |
| Vehicles | $4,600.00 |
| Slot machines and gaming equipment | $242,580.42 |
| Food and Beverage inventory | $23,928.08 |
| Other equipment and furnishings | $6,006.21 |
| Prepaids | $52,220.32 |
| TOTAL | $9,222,543.71 |

## VI. SIGNIFICANT POST-PETITION EVENTS

The following significant events have occurred post-petition:

At the time of filing of the Petition, the Debtor maintained checking, merchant and payroll accounts at Bank of America, who froze all accounts and refused payment of any checks drawn on the accounts until such time as "First Day Orders" were entered. The Debtor then filed emergency motions to allow for payment of pre-petition wages, maintenance of pre-petition bank accounts and payments to critical vendors, along with an emergency motion for interim use of cash that may be claimed as collateral [Docket Nos. 17, 18 and 19] ("First Day Motions"). Those First Day Motions were heard on an Order Shortening Time on May 10, 2013, at 4:00 p.m. The Court granted the First Day Motions with the caveat that it was not at

this time deeming the gaming revenue of the Debtor as cash collateral for the secured lenders, and also scheduled a hearing for final approval of the monthly adequate protection payments proposed by the Debtor, for June 13, 2013, at 9:30 a.m.

## VII. ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

ADMINISTRATIVE CLAIMS: All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtor's estate, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. § 507(a)(1) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date of the Plan. The holders of these claims include the attorneys and accountants for the Debtor, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee. The estimated administrative expenses for the Debtor's reorganization proceeding are from $100,000.00 up to $200,000.00, and consist of:

| | |
|---|---|
| $0.00 | Trustees fees that are owed the U.S. Trustee's Office for the applicable quarters of 2013 prior to plan confirmation [payment is anticipated to be made when due]; |
| $100,000.00 | Estimated professional fees for the Debtor's general bankruptcy attorney, Stephen R. Harris, Esq., of HARRIS LAW PRACTICE LLC, calculated as of the date of confirmation (estimated at $200,000.00 for a contested confirmation and hearing and $100,000.00 for an uncontested confirmation hearing); |
| $0.00 | Post-petition accounts payable with [all post-petition administrative expenses are expected to be paid in full in the normal course of business prior to confirmation]. |

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

UNCLASSIFIED PRIORITY TAX CLAIMS:

1. **Description**. The Debtor's priority tax claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|---|---|---|---|
| Douglas County Treasurer | 10,261.87 | | 0.00 |
| Internal Revenue Service | $10,732.96 | $11,745.46 | $11,745.46 |
| Nevada Department of Taxation | $5,476.07 | | 0.00 |
| **Total:** | $26,470.90 | 11,745.46 | $11,745.46 |

Pursuant to the Debtor's Plan, the treatment and disposition of the unclassified priority tax claims, if any, will be as follows: Any claim discrepancy will be resolved by the claim objection process, with the stipulated amount and/or Court decreed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtor.    All unclassified priority tax creditors, if any, shall be paid 100% of their allowed claim amount, with statutory interest thereon, on or before the Effective Date of the Plan.  In the event the Debtor fails to make the payments as set forth hereinabove, the allowed priority tax creditors, if any, shall have the right to proceed with any administrative remedies available to them, fifteen (15) days after written notice of default has been given to the Debtor and its attorney, Stephen R. Harris, Esq.

## VIII.  CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, claims against the estate have been divided into the following classifications for purposes of administration and voting on the Plan:

1A.    CLASS 1A SECURED CLAIM [NEVADA STATE BANK]:  This Class consists of the secured claim of NEVADA STATE BANK as successor in interest to GREAT BASIN BANK OF NEVADA ("NSB"), in the approximate unpaid principal sum of $1,638,789.79, plus accruing interest at the contractual rate, calculated as of the Petition Date. The Class 1A claim of NSB is secured by a first priority deed of trust recorded against the real property commonly described as APN 1320-33-401-15 through 16, 18 and 1320-33-401-029 through 032, on which the Sharkey's Casino is located.  NSB also claims a security interest as described in the UCC-1 filed with the Nevada Secretary of State on January 15, 2009, as document number

2009001211-9 on behalf of Great Basin Bank of Nevada, which claims interest in "Gaming devices (as defined in NRS 463.0155) and associated equipment (as defined in NRS 463.0136) of said gaming devices, including, but not limited to the devices listed on Exhibit 1 hereto and their associated equipment, whether now owned or hereafter acquired for use at the real property described in Exhibit 2 hereto and, and all accession, additions, replacements substitutions, income, revenue and proceeds from the foregoing." (Exhibits omitted.)  While the UCC-1 filing of NSB claims an interest in the income derived from the gaming devices, it is questionable under Nevada law as to whether it is entitled to that claim, as it is not a licensed gaming entity.

1B.  <u>CLASS 1B SECURED CLAIM [NEVADA STATE BANK]</u>.  This Class consists of the secured claim of NSB created as a result of the modification of the Class 1A claim of NSB in the original principal balance of $59,790.61, with a current unpaid balance of approximately $48,190.52, which is secured on the same real and personal property as the Class 1A claim.

2.  <u>CLASS 2 SECURED CLAIM [SEE HORSE 1, LLC]</u>:  This Class consists of the secured claim of SEE HORSE 1, LLC ("SH1") as the assignee of Umpqua Bank, who was the successor in interest to Nevada Security Bank, which was the successor in interest to Northern Nevada Bank, in the approximate unpaid principal sum of $3,796,756.64 , plus accruing interest at the contractual rate, calculated as of the Petition Date.  The Class 2 secured claim of SH1 is secured by a second priority deed of trust recorded against the real property commonly described as APN 1320-33-401-15 through 16, 18 and 1320-33-401-029 through 032, on which the Sharkey's Casino is located.  SH1 also claims a security interest, as the successor to Umpqua Bank, in the personal property located on the Debtor's premises pursuant to a UCC1 filed on behalf of Umpqua Bank on October 4, 2011 as document number 2011026392-4 with the Nevada Secretary of State. SH1 has not refiled a UCC-1 on its own behalf.  The Debtor disputes the amount claimed as owed by SH1.

3A.  <u>CLASS 3A SECURED CLAIM [CITY NATIONAL BANK]</u>:  This Class consists of the secured claim of City National Bank, as the successor in interest to Business

Bank of Nevada in the approximate unpaid principal sum of $102,804.18, plus accruing interest at the contractual rate, calculated as of the Petition Date. The Class 3A claim of City National Bank is secured by a first priority interest in the real property commonly described as APN1320-33-401-017.

3B    CLASS 3B SECURED CLAIM [CITY NATIONAL BANK]:    This Class consists of the secured claim of City National Bank as successor in interest to Business Bank of Nevada in the approximate unpaid principal sum of $102,746.53, plus accruing interest at the contractual rate, calculated as of the Petition Date. The Class 3B claim of City National Bank is secured by a first priority interest in the real property commonly described as APN1320-33-401-033.

4A.    CLASS 4A SECURED CLAIM [PDS GAMING CORPORATION, NEVADA: This Class consists of the secured interest of PDS GAMING CORPORATION – NEVADA (PDS) in gaming equipment leased to the Debtor by PDS evidenced by two UCC-1 Financing Statements filed as Document Nos. 2012010932-4 and 201231164-0 with the Nevada Secretary of State, each of which in addition to identifying certain gaming equipment, and all other equipment leased or to be leased under the Lease Agreements and also claiming an interest in and to "1) all security deposits, holdbacks, reserves and other monies belonging or payable to lessee in connection with the Lease and the Equipment; 2) all accounts, chattel paper, contract rights, documents, equipment, fixtures, general intangibles (patents, copyrights, trade names and trademarks), goods, instruments and inventory pertaining to the lease and the lease equipment; 3) all accessions, accessories, additions, amendments, attachments, modifications, replacements and substitutions to any of the foregoing; 4) all proceeds and products of any of the foregoing; (5) all policies of insurance pertaining to any of the foregoing as well as any proceeds pertaining to such policies; and 6) all books and records pertaining to any of the foregoing".

4B.    CLASS 4B SECURED CLAIM [INTERNATIONAL GAME TECHNOLOGY]: This Class consists of the secured interest of INTERNATIONAL GAME TECHNOLOGY (IGT) in gaming equipment leased to the Debtor by IGT evidenced by two UCC-1 Financing

Statements filed as Document Nos. 200900-6237-7 and 2009006246-6 each of which claims a security interest in certain gaming devices in the possession of the Debtor.

4C.    CLASS 4C SECURED CLAIM [NEVADA BANK & TRUST COMPANY]: This claim consists of the secured interest of NEVADA BANK & TRUST COMPANY (NBT) in gaming equipment purchased by the Debtor from KONAMI as evidenced a UCC-1 Financing Statement filed as Document No. 2010005772-3 with the Nevada Secretary of State, which claims a security interest in certain gaming devices in the possession of the Debtor.

4D.    CLASS 4D SECURED CLAIM [KONAMI GAMING INC.]:    This claim consists of the security interest held by Konami Gaming Inc., as evidenced by the Security Agreement executed and dated May 11, 2010 by the Debtors that is attached as Exhibit C to the First Amendment to the System Purchase and License Agreement of even date between Holder Hospitality Group and Konami Gaming, Inc., which encumbers gaming equipment located in the Debtor's casino.

5. CLASS 5 CLAIMS [GENERAL UNSECURED ALLOWED CREDITORS]:    This Class consists of all allowed general unsecured claims against the Debtor and disputed claims to the extent disputed claims may be proven and allowed by the Court.    The Class 5 Allowed General Unsecured Claims as of the Petition Date totaled approximately $873,438.13, detailed as follows:

| CREDITOR CLAIMS | SCHEDULED AMOUNT | PROOF OF CLAIM AMOUNT | ALLOWED AMOUNT |
|---|---|---|---|
| A #1 CHEMICAL, INC | $466.67 | | $466.67 |
| ACE HARDWARE | $550.97 | | $550.97 |
| AMERIPRIDE SERVICES, INC. | $2,998.99 | Critical Vendor paid post-petition | $0.00 |
| BEST BREWED TEAS | $161.20 | Critical Vendor paid post-petition | $0.00 |
| BMI | $953.73 | $999.37 | $999.37 |
| C & M FOOD DISTRIBUTORS | $3,556.93 | Critical Vendor paid post-petition | $3,556.93 |
| CROWN BEVERAGES, INC | $540.49 | Critical Vendor paid post-petition | $0.00 |

| | | | |
|---|---|---|---|
| DMS DIRECT INC. | $532.05 | Critical Vendor paid post-petition | $0.00 |
| DYNASTY GAMES | $997.79 | Critical Vendor paid post-petition | $997.79 |
| FARMER BROS. COFFEE | $1,912.47 | Critical Vendor paid post-petition | $0.00 |
| FIREMANS FUND INSURANCE | $20,000.00 | | $20,000.00 |
| FRANCO FRENCH | $765.97 | Critical Vendor paid post-petition | $0.00 |
| INTERNAL REVENUE SERVICE | $0.00 | $2,727.23 | $2,727.23 |
| J W WELDING SUPPLY | $1,163.79 | | $1,163.79 |
| MILOS SHARKEY BEGOVICH LIVING TRUST DTD 5/2/02 | $760,391.50 Disputed | | 700,000.00* |
| MINDEN & GARDNERVILLE SANITATION DISTRICT | $2,975.78 | Critical Vendor paid post-petition | $0.00 |
| MODEL DAIRY, INC | $2,031.51 | Critical Vendor paid post-petition | $0.00 |
| NEVADA RESTAURANT SUPPLY | $114.88 | | $0.00 |
| NEW WEST | $1,412.45 | Critical Vendor paid post-petition | $0.00 |
| PONDEROSA MEAT & PROVISIONS | $8,101.05 | Critical Vendor paid post-petition | $0.00 |
| SAGE BUSINESS WORKS | $868.85 | | $868.85 |
| SCOLARI'S FOOD & DRUG | $73.99 | | $0.00 |
| SIERRA NEVADA MEDIA GROUP | $300.00 | | $300.00 |
| SIMPLEX GRINNELL | $432.12 | | $432.12 |
| SKILLMAN GROUP, LLC | $4,300.00 | | $4,300.00 |
| SOUTHERN WINE SPIRITS | $2,708.87 | Critical Vendor paid post-petition | $0.00 |
| STAPLES BUSINESS ADVANTAGE | $2,019.38 | Critical Vendor paid post-petition | $1,674.28 |
| STOR-ALL | $396.00 | | $0.00 |
| SWIRE COCA-COLA, USA | $2,842.00 | Critical Vendor paid post –petition | $1,109.20 |
| | | $1,332.80 | |
| TAVERN PRODUCTS INC | $836.25 | Critical Vendor paid post-petition | $0.00 |
| THE HOLDER GROUP SUNDANCE, LLC (Insider) | $57,333.32 | | $57,333.32 |

HARRIS LAW PRACTICE LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NV 89511
775 786 7600

| | | | |
|---|---|---|---|
| THE HOLDER GROUP, LLC (Insider) | $66,783.21 | | $66,783.21 |
| TOWN OF GARDNERVILLE | $2,760.14 | Critical Vendor paid post-petition | $1,887.63 |
| US FOODS | $7,333.46 | Critical Vendor paid post-petition | $7,325.46 |
| WEDCO INC. | $961.31 | | $961.31 |
| WIRTZ BEVERAGE NV | $603.20 | Critical Vendor paid post-petition | $0.00 |
| **TOTALS** | **$960,180.32** | | **$873,438.13** |

*Allowance subject to zero interest.

6. <u>CLASS 6 EQUITY INTERESTS OF DEBTOR</u>: This Class consists of the members' equity interests in THE HOLDER GROUP SHARKEY'S, LLC, specifically: THE HOLDER GROUP, LLC as to a 100% membership interest.

## IX.  TREATMENT OF CLASSES

1A.    <u>CLASS 1A SECURED CLAIM [NEVADA STATE BANK]</u>:  The Class 1A secured Claim of NSB shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included, less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the 10th day of the month following the Confirmation Date, and continuing on the tenth day of each successive month for eight (8) years thereafter, with the entire amount of Modified Loan Balance to be paid eight (8) years after the Confirmation Date or upon sale of the Real Property, whichever occurs first in time.   Any payment due shall be subject to a fifteen (15) day grace period to cure same.   The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.  Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in <u>In re</u>

1  Till, 301 F.3d 583,591 (2002), and has been applied by this Court in previous confirmation

2  hearings in early 2013. Accordingly, the Class 1A secured claim of NSB is impaired.

3      1B.   **CLASS 1B SECURED CLAIM [NEVADA STATE BANK]**:  The Class 1B

4  secured claim of NSB shall retain its existing security interest and the outstanding loan balance

5  shall be recalculated using the outstanding principal balance plus accrued interest at the non-

6  default rate of interest from the Petition Date to the Confirmation Date, plus reasonable

7  attorney's fees and collection costs, with no late fees to be included,  less post-petition amounts

8  paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan

9  Balance shall be repaid in equal payments of $2,200 per month with interest calculated at 5.25%

10  on the principal balance, to be paid on or before the 10th day of each successive month until paid

11  in full, commencing May, 2013. Any payment due shall be subject to a fifteen (15) day grace

12  period to cure same.    The Modified Loan Balance shall be deemed current as of the

13  Confirmation Date and any Notice of Default shall be released and rescinded.    Debtor believes

14  the interest rate proposed herein is appropriate based on the decision rendered in In re Till,

15  301 F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in

16  early 2013. Accordingly, the Class 1B secured claim of NSB is impaired.

17      2. CLASS 2 SECURED CLAIM [SEE HORSE 1, LLC]:  The Class 2 secured claim of

18  SH1 shall retain its existing security interest and the outstanding loan balance shall be

19  recalculated using the outstanding principal balance plus accrued interest at the non-default rate

20  of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and

21  collection costs, with no late fees to be included less post-petition amounts paid to principal and

22  interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in

23  monthly payments of principal and interest at the rate of 5.25% per annum accruing after the

24  Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the

25  twentieth day of the month following the Confirmation Date, and continuing on the twentieth

26  day of each successive month for eight (8) years thereafter, with the entire amount of Modified

27  Loan Balance to be paid eight (8) years after the Confirmation Date or upon sale of the Real

28  Property, whichever occurs first in time.  Any payment due shall be subject to a fifteen (15) day

grace period to cure same.    The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.    Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013. Accordingly, the Class 2 secured claim of SH1 is impaired.

3A.    CLASS 3A SECURED CLAIM [CITY NATIONAL BANK]:  The Class 3A claim of City National Bank shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included,  less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the fifth day of the month following the Confirmation Date, and continuing on the fifth day of each successive month for four (4) years thereafter, with the entire amount of Modified Loan Balance to be paid four(4) years after the Confirmation Date or upon sale of the Real Property, whichever occurs first in time.    Any payment due shall be subject to a fifteen (15) day grace period to cure same.   The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.     Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013. Accordingly, the Class 3A claim of City National Bank is impaired.

3B.    CLASS 3B SECURED CLAIM [CITY NATIONAL BANK]: The Class 3B claim of City National Bank shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included, less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").   The Modified Loan

1   Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per

2   annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization,

3   commencing upon fifth day of the month following the Confirmation Date, and continuing on

4   the fifth day of each successive month for four (4) years thereafter, with the entire amount of

5   Modified Loan Balance to be paid four (4) years after the Confirmation Date or upon sale of the

6   Real Property, whichever occurs first in time.   Any payment due shall be subject to a fifteen

7   (15) day grace period to cure same.   The Modified Loan Balance shall be deemed current as of

8   the Confirmation Date and any Notice of Default shall be released and rescinded.     Debtor

9   believes the interest rate proposed herein is appropriate based on the decision rendered in In re

10  Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation

11  hearings in early 2013.   Accordingly, the Class 3B secured claim of City National Bank is

12  <u>impaired.</u>

        4A.   <u>CLASS 4A SECURED CLAIM [PDS GAMING CORPORATION, NEVADA</u>:

13  

14  The Class 4A secured claim of PDS shall be paid according to the existing terms and conditions

15  of the secured lease.  Accordingly, the Class 4A claim of PDS is <u>unimpaired</u> under the Plan.

        4B.   <u>CLASS 4B SECURED CLAIM [INTERNATIONAL GAME TECHNOLOGY]:</u>

16  

17  The Class 4B secured claim of IGT shall be paid according to the existing terms and conditions

18  of the secured lease. Accordingly, the Class 4B claim of IGT is <u>unimpaired</u> under the Plan.

        4C.   <u>CLASS 4C SECURED CLAIM [NEVADA BANK & TRUST COMPANY]</u>:

19  

20  The Class 4C Secured claim of Nevada Bank & Trust Company shall be paid according to the

21  existing terms and conditions of the secured loan agreement. Accordingly, the Class 4C claim of

22  Nevada Bank and Trust Company are <u>unimpaired</u> under the Plan.

        4D.   <u>CLASS 4D SECURED CLAIM [KONAMI GAMING INC.]:</u>

23  

24  The Class 4D secured claim of Konami Gaming Inc., shall be paid pursuant to the terms of the

25  Security Agreement executed and dated May 11, 2010 by the Debtors that is attached as Exhibit

26  C to the First Amendment to the System Purchase and License Agreement of even date between

27  Holder Hospitality Group and Konami Gaming, Inc.   Accordingly, the Class 4D claim of

28  Konami Gaming Inc., is <u>unimpaired</u> under the Plan.

5. <u>CLASS 5 CLAIMS [GENERAL UNSECURED ALLOWED CREDITORS]</u>:

The Class 5 General Unsecured Allowed Creditors, shall be paid 100% of their allowed claims by the Debtor, within eight (8) years of the Confirmation Date in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization until paid in full, with the exception of the claim of the MILOS SHARKEY BEGOVICH LIVING TRUST DTD 5/2/02, which is deemed an allowed claim of $700,000.00, payable monthly at zero percent interest pursuant to the terms of the parties' promissory note, to be amortized over a thirty (30) year period, and to be paid in full eight (8) years following the Confirmation Date. . Accordingly, the Class 5 General Unsecured Claims are <u>impaired</u> under the Plan.

6. <u>CLASS 6 EQUITY INTERESTS OF DEBTOR</u>:  The equity interests of the members of THE HOLDER GROUP SHARKEY'S, LLC existing on the Petition Date shall remain unchanged.  Accordingly, the Class 6 interests of the Debtor are <u>unimpaired</u> under the Plan.

## X. <u>BAR DATE FOR FILING CLAIM</u>

The bar date for filing a proof of claim in this case is September 3, 2013, for all creditors (except a governmental unit).  The bar date for objecting to claims will be sixty (60) days after the date on which the PLAN is confirmed by the Court.  All priority unsecured and general unsecured claims which are listed as disputed in the PLAN or who believe that the amounts listed in the PLAN are incorrect, shall file proofs of claim in this case by the bar date set forth above.  Failure to file a proof of claim by a disputed claimant or a claimant who disagrees with the amount listed in the PLAN within such time period will result in the amount listed in the PLAN being established as the amount owing to such creditor, and such creditor will participate in the PLAN, based upon its claim listed in the PLAN.

## XI. <u>MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN</u>

1.    **Operation of the Business and Disbursements Therefrom**

The Debtor is a duly licensed casino currently operating 138 gaming machines, and containing an independently operated sports book.  While the Debtor's income decreased dramatically in 2010, steady increases in income have been posted for 2011 and 2012.  It is

anticipated that net income for 2013 will approximate that of 2009. The Debtor will have sufficient cash flow from ongoing operations to sustain the debt service contained in the Plan. Attached hereto as Exhibit A and incorporated herein by that reference are the Comparison of Budget to Actual for May 2013 through July 2013, the Monthly Budget for May through July 2014, an Actual Statement of Cash Receipts and Disbursements for May 2013 through July 2013 and a Forecasted Statement of Cash Receipts and Disbursements August 2013 through July 2014 (collectively the "Budget").

**2.    Post-Confirmation Default**

In the event the Debtor becomes delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel. The Debtor shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default. In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon the real property (if a secured creditor) or take other appropriate action. The Debtor shall have the right to bring the issue of default before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to cure the default in a reasonable period of time. The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

**3.    Professionals' Fees**

After the Confirmation Date of the Plan, the Debtor and any other professional, such as Debtor's general bankruptcy counsel, any special purpose counsel or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtor's professionals shall be at their normal hourly rate(s) and customary cost charges.

**4.    Distribution**

All cash proceeds shall be distributed in the foregoing  manner except amounts necessary to pay disputed claims against the Debtor in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or

as are judicially determined.

5.    **Taxes**

Unless otherwise provided in the Plan, all taxes are paid current and there are no tax liens on real or personal property owned by the Debtor.

## XII. PROVISIONS GOVERNING DISTRIBUTION AND DISCHARGE

1.    THE DISBURSING AGENT.

THE HOLDER GROUP SHARKEY'S, LLC, in its capacity as Debtor and Debtor-in-Possession, is ultimately responsible for making all distributions pursuant to the Plan. To assist it in discharging those responsibilities, Debtor shall select a depository institution authorized by the Court for all funds which are to be sequestered for claims of creditors and ultimately distributed to creditors holding allowed claims.

2.    UNCLAIMED DISTRIBUTIONS.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtor.

3.    EFFECT OF CONFIRMATION.

Upon confirmation and performance of the Plan, THE HOLDER GROUP SHARKEY'S, LLC, shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d). In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the assets of THE HOLDER GROUP SHARKEY'S, LLC, including stay of default proceedings.

4.    EXCULPATION.

Neither the Unsecured Creditors' Committee, if any, nor Debtor nor any of their respective members, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this

Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence, willful misconduct or fraud.

## XIII. POST-CONFIRMATION INJUNCTION

No entity may commence or continue any action or proceeding, or perform any act to interfere with the implementation and consummation of the PLAN and the payments to be made thereunder; or (ii) assert any claim, counter-claim, cross-claim, affirmative defense, defense, set off, recoupment or any action of any kind or nature (collectively "Potential Actions") against the Debtor, its members, managers, employees, directors, attorneys, agents, representatives, or any successors or assigns of any or all of the foregoing Persons.

Confirmation of the PLAN shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions.

## XIV. EXECUTORY CONTRACTS

Reservation of Rights. The Debtor reserves the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtor. At this time, the Debtor is the Lessor to a sports book owned by Sierra Development Company dba Club Cal Neva that is located on its premises, in addition to being a party to the leases and executory contracts listed on the Debtor's Schedule G filed with this Court and attached hereto and incorporated herewith as **Exhibit "B"**. All of the Debtor's leases and executory contracts were entered into in the ordinary course of business and Debtor hereby assumes its lease with Sierra Development Company and all leases and executory contracts detailed in the attached **Exhibit "B"**.

## XV. MISCELLANEOUS PROVISIONS

Notice. Any notice described in or required by the terms of this PLAN or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five

days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

> The Debtor, addressed to:
> STEPHEN R. HARRIS, ESQ.
> HARRIS LAW PRACTICE LLC
> 6151 Lakeside Drive, Suite 2100
> Reno, NV 89511

Headings.   the headings used herein are inserted for convenience only and neither constitute a portion of the PLAN nor in any manner affect the construction of the provisions of the PLAN.

Severability.   Should any provision of this Plan be determined to be unenforceable following the Effective date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

Governing Law.   Except to the extent that the Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada.

Successors and Assigns.   The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such person.

Designation of Managers.   Those individuals who were acting as Managers of the Debtor as of the Petition Date, shall continue to serve in the capacity to which they were appointed.  Specifically, HAROLD D. HOLDER, SR. shall continue to serve as Manager of the Debtor. Mr. Holder is an employee of CMS International.  . CMS International is an affiliate of the Debtor that provides management services to all of the entities owned by the Holder Group. and Mr. Holder shall receive his compensation from CMS International and not from the Debtor.  CMS International will continue to provide management services to the Debtor for a fee of $6,000.00 per week, although commencing September 2013, CMS International will defer its management fee until such time as the Debtor has sufficient cash flow to meet both its operating expenses and debt service under the Plan.

## XVI. <u>PROCEDURES FOR RESOLVING CONTESTED CLAIMS</u>

<u>Claims Objections</u>.  Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than sixty (60) days after the Confirmation Date.

<u>Payment Procedures</u>.  Payments to the holder of a Claim to which objection has been made that ultimately becomes an Allowed Claim shall be made in accordance with the provision of the PLAN with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs.  However, interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

<u>Avoidance Actions</u>.  To the extent appropriate, the Debtor shall have the right to bring any and all avoidance actions, the same to be commenced with 90 days of the Confirmation date.  Proceeds of all avoidance actions shall vest in the Debtor pursuant to 11 U.S.C. §1141.

## XVII. <u>CONFIRMATION REQUEST</u>

The Debtor request that the PLAN be confirmed in accordance with the provisions of §1129(a) and/or §1129(b) of the Code.

## XVIII. <u>RETENTION OF JURISDICTION</u>

Notwithstanding confirmation of this PLAN, the Court will retain jurisdiction for the following purposes, and each of them:

1.    The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or by any other party in interest entitled to proceed in that manner.  As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2.    The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this PLAN.

HARRIS LAW PRACTICE LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NV 89511
775 786 7600

3.    The Court will retain jurisdiction to facilitate the consummation of this PLAN by entering, consistent with the provisions of this PLAN, any further necessary or appropriate order(s) regarding the enforcement of this PLAN and any provision(s) thereof.

4.    The Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in this PLAN, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtor may deem it appropriate to initiate and prosecute in aid of its reorganization.

5.    The Court will retain jurisdiction to enter an appropriate final decree in this Reorganization Case.

6.    The Court will retain jurisdiction to enter an appropriate final decree, and any interim order(s), in any adversary proceedings which may be initiated during this Chapter 11 proceeding.

## XIX. FEASIBILITY OF DEBTOR'S PLAN

Sharkey's Casino is a small local casino in Gardnerville, Nevada, catering to local patrons and patrons from the bordering communities in California, as well as some pass through traffic. Debtor believes that the PLAN is feasible based upon the improved income generated from business operations over the past two years, coupled with the restructuring of the Debtor's secured debt. Additionally, Debtor has hired a more experienced General Manager, and since that time the food operation has seen steady improvement, and the slot machines have been upgraded and rearranged on the casino floor.    In spite of a slight decrease in gross receipts, Debtor has shown a significant increase in its operating income or earnings before interest, depreciation and amortization ("EBITDA") compared to 2012.  Indeed, for the first seven (7) months of 2013, Debtor has exceeded 2012 actual EBITDA by 15%, with July 2012 reporting year to date EBITDA of $500,170 and July 2013 reporting year to date EBITDA of $575,210. CMS International, the company that provides management services to the Debtor has agreed to defer its management fee of $6,000.00 per week in order to increase cash flow for the Debtor. Attached hereto as Exhibit A and incorporated herein by that reference are the Comparison of

Budget to Actual for May 2013 through July 2013, the Monthly Budget for May 2013 through July 2014, an Actual statement of Cash Receipts and Disbursements for May 2013 through July 2013 and a Forecasted Statement of Cash Receipts and Disbursements from August 2013 through July 2014 (collectively the "Budget"). The Budget clearly shows the removal of payment of management fees to CMS through July 2014. Based on current year earnings to date, the Debtor believes that the 2013 budgeted annual EBITDA of $1,012,600.00, is attainable.

## XX. LIQUIDATION ANALYSIS

Debtor is proposing an operating PLAN where its assets will continue to be operated by the Debtor.

The PLAN must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 case, the general rule is that the debtor's assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

A creditor would recover from the assets of the bankruptcy estate less under Chapter 7 than under Chapter 11 for two reasons. First, the estimated market value of the Debtor' non-exempt encumbered assets under normal selling conditions, estimated at between $5,000,000 and $8,000,000 are encumbered by secured liabilities of approximately $5,900,000.00, and the value of the assets would severely decline in a forced liquidation. Further, after deducting costs incurred in having to maintain and insure the encumbered real property and to market and sell such property, along with the time for such process, any equity that exists, if any, in the property would be significantly reduced. Additionally, the unencumbered non-exempt assets are minimal and virtually unsaleable in the current market. Second, in a Chapter 7 case a trustee is

appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors.

Assuming the Debtor had to pay out all of the monies outlined above, including those monies being asserted by the secured creditors, it is unlikely the Debtor would be left with any significant amounts for payment to General Unsecured Creditors and distribution to Debtor's equity holders. Thus, if there were a liquidation of assets, Debtor believes that general unsecured creditors would not receive more on their claims than is being proposed in Debtor's Plan, due to the nature and amount of the secured claims against the Debtor's assets and the nature and value of such assets. Additionally, even if there were sufficient amounts to pay general unsecured creditors in full on liquidation, Debtor's Plan proposes payment in full with interest thereon so general unsecured claims would not receive more from a liquidation.

Respectfully submitted this ___5th___ day of September, 2013.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC

/s/ Stephen R Harris
Attorneys for Debtor

1

## VERIFICATION

2

3       I, HAROLD D. HOLDER, SR, Manager of THE HOLDER GROUP SHARKEY'S,

4   LLC, Debtor, declare under penalty of perjury that I have read the foregoing DEBTOR'S

5   FIRST AMENDED DISCLOSURE STATEMENT, and that the contents contained therein are

6   true and correct to the best of my knowledge, information and belief.

7       DATED this 5th day of September, 2013.

8

9

10       Harold D. Holder, Sr., Manager
           THE HOLDER GROUP SHARKEY'S, LLC,
11           Debtor

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# EXHIBIT "A"

**Sharkey's**
**Comparison of Actual to Budget**
**For the Months Ended May 2013 Through July 2013**

| | Actual May-13 | Budgeted May-13 | Variance | Actual Jun-13 | Budgeted Jun-13 | Variance | Actual Jul-13 | Budgeted Jul-13 | Variance |
|---|---|---|---|---|---|---|---|---|---|
| Net Revenues | 268,675 | 271,000 | (2,325) | 269,349 | 274,000 | (4,651) | 256,028 | 255,000 | 1,028 |
| **Cost of Sales** | | | | | | | | | |
| Food | 33,966 | 36,070 | (2,104) | 28,573 | 36,000 | (7,427) | 34,197 | 35,000 | (803) |
| Bar | 8,886 | 9,543 | (657) | 10,635 | 8,050 | 2,585 | 10,737 | 8,200 | 2,537 |
| Total Cost of Goods Sold | 42,852 | 45,613 | (2,761) | 39,208 | 44,050 | (4,842) | 44,934 | 43,200 | 1,734 |
| Gross Profit | 225,823 | 225,387 | 436 | 230,141 | 229,950 | 191 | 211,095 | 211,800 | (706) |
| **Operating Expenses:** | | | | | | | | | |
| Payroll expense | 106,972 | 107,100 | (128) | 99,411 | 98,949 | 462 | 105,123 | 98,571 | 6,552 |
| Taxes & licenses | (14,334) | 19,931 | (34,265) | 18,826 | 22,478 | (3,652) | 17,611 | 18,800 | (1,189) |
| Insurance | 5,995 | 4,950 | 1,045 | 3,111 | 8,250 | (5,139) | 5,263 | 6,600 | (1,337) |
| Utilities | 9,553 | 10,824 | (1,271) | 10,285 | 11,000 | (715) | 11,443 | 11,775 | (332) |
| Leasing & rental expense | 1,248 | 769 | 479 | 1,319 | 769 | 550 | 1,242 | 769 | 473 |
| Advertising & promotion | 2,708 | 4,166 | (1,458) | (362) | 5,000 | (5,362) | 886 | 5,000 | (4,114) |
| Telephone | 989 | 1,385 | (396) | 963 | 949 | 14 | 974 | 949 | 25 |
| Entertainment | 2,500 | 1,700 | 800 | 1,900 | 2,500 | (600) | 1,670 | 2,000 | (330) |
| Laundry & uniforms | 1,316 | 1,500 | (184) | 1,552 | 1,500 | 52 | 1,727 | 2,000 | (273) |
| Dues and subscriptions | 188 | 300 | (112) | 304 | 300 | 4 | (1,556) | 300 | (1,856) |
| Postage & freight | 1 | 50 | (49) | 0 | 50 | (50) | 0 | 50 | (50) |
| Repairs & maintenance | 2,589 | 3,000 | (411) | 2,181 | 3,000 | (819) | 2,236 | 3,000 | (764) |
| Supplies | 3,111 | 700 | 2,411 | 3,046 | 700 | 2,346 | 666 | 700 | (34) |
| Travel, meals & entertainment | 0 | 500 | (500) | 0 | 500 | (500) | 0 | 500 | (500) |
| Auto expense | 347 | 250 | 97 | 75 | 250 | (175) | 262 | 250 | 12 |
| Other | 3,145 | 2,186 | 959 | 1,630 | 4,050 | (2,420) | 2,078 | 3,690 | (1,612) |
| Total Operating Expenses | 126,328 | 159,311 | (32,983) | 144,241 | 160,245 | (16,004) | 149,625 | 154,955 | (5,330) |
| Operating Income (EBITDA) | 99,495 | 66,076 | 33,419 | 85,900 | 69,705 | 16,195 | 61,470 | 56,845 | 4,624 |

Sharley's
Budgeted Profit & Loss Statement
For the Months Ended May 1, 2013 through July 31, 2014
Prepared Based upon the Accrual Basis of Accounting

| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Weeks | 5 | 4 | 5 | 4 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 4 | 5 | 4 | 5 |
| Net Revenues | 271,000 | 274,000 | 255,000 | 287,000 | 268,200 | 305,000 | 292,700 | 269,200 | 266,800 | 258,500 | 303,000 | 254,000 | 268,700 | 269,000 | 256,000 |
| **Cost of Sales** | | | | | | | | | | | | | | | |
| Food | 36,070 | 36,000 | 35,000 | 38,000 | 32,000 | 36,000 | 30,900 | 30,400 | 30,400 | 27,900 | 30,400 | 33,900 | 35,900 | 30,400 | 31,200 |
| Bar | 9,543 | 8,050 | 8,200 | 8,800 | 11,200 | 11,000 | 8,800 | 12,500 | 8,500 | 8,800 | 10,900 | 11,800 | 9,300 | 10,900 | 10,600 |
| Total Cost of Goods Sold | 45,613 | 44,050 | 43,200 | 46,800 | 43,200 | 47,000 | 39,700 | 42,900 | 38,900 | 36,700 | 41,300 | 45,700 | 45,200 | 41,300 | 41,800 |
| Gross Profit | 225,387 | 229,950 | 211,800 | 240,200 | 225,000 | 258,000 | 253,000 | 226,300 | 227,900 | 221,800 | 261,700 | 208,300 | 223,500 | 227,700 | 214,200 |
| **Operating Expenses:** | | | | | | | | | | | | | | | |
| Payroll expense | 107,100 | 98,949 | 98,571 | 99,429 | 87,429 | 100,343 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 |
| Taxes & licenses | 19,931 | 22,478 | 18,800 | 19,300 | 19,300 | 19,300 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 |
| Insurance | 4,950 | 8,250 | 6,600 | 8,250 | 7,719 | 7,719 | 2,295 | 2,295 | 2,295 | 5,263 | 6,531 | 5,263 | 9,651 | 5,263 | 5,263 |
| Utilities | 10,824 | 11,000 | 11,775 | 10,075 | 11,775 | 12,475 | 10,000 | 10,000 | 11,000 | 10,000 | 9,500 | 9,500 | 9,500 | 10,500 | 11,500 |
| Leasing & rental expense | 769 | 769 | 769 | 769 | 769 | 769 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 |
| Advertising & promotion | 4,156 | 5,000 | 5,000 | 7,000 | 3,500 | 7,000 | 2,500 | 2,000 | 2,500 | 1,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 |
| Teletphone | 1,385 | 949 | 949 | 949 | 949 | 949 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 |
| Entertainment | 1,700 | 2,500 | 2,000 | 2,500 | 2,000 | 2,500 | 1,000 | 2,000 | 2,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 |
| Laundry & uniforms | 1,500 | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 |
| Dues and subscriptions | 300 | 300 | 300 | 300 | 300 | 300 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Postage & Freight | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Repairs & maintenance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 2,981 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Supplies | 700 | 700 | 700 | 700 | 700 | 700 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 |
| Travel, meals & entertainment | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Auto expense | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Other | 2,186 | 4,050 | 3,690 | 4,600 | 4,920 | 4,650 | 4,600 | 4,600 | 4,600 | 1,600 | 4,600 | 4,600 | 4,600 | 3,481 | 4,600 |
| Total Operating Expenses | 159,311 | 160,245 | 154,955 | 159,672 | 145,161 | 152,505 | 148,612 | 149,112 | 151,112 | 148,061 | 152,848 | 151,580 | 155,998 | 148,461 | 154,580 |
| Operating Income (EBITDA) | 66,076 | 69,705 | 56,845 | 80,528 | 79,839 | 95,495 | 104,388 | 77,188 | 76,788 | 73,739 | 108,852 | 56,720 | 67,532 | 79,239 | 59,610 |

**Owner's Adjustments to Arrive at EBITDA:**

| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Depreciation | 13,769 | 13,769 | 13,769 | 13,769 | 13,769 | 13,769 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 |
| Interest[1] | 31,519 | 31,811 | 31,448 | 31,738 | 31,701 | 31,241 | 28,174 | 28,142 | 28,110 | 28,079 | 28,047 | 28,014 | 27,982 | 27,950 | 27,917 |
| Amortization | 5,167 | 5,167 | 5,167 | 5,167 | 1,925 | 1,925 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 |
| Slot participation/splits | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 |
| Corporate management fees | 12,000 | 24,000 | 30,000 | 24,000 | 3,000 | - | - | - | - | - | - | - | - | - | - |
| Non-recurring fees[2] | 16,667 | 16,667 | 16,667 | 21,542 | 16,666 | 21,541 | - | - | 4,875 | - | - | 4,875 | - | - | 4,875 |
| Excess Employee Benefits[3] | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 |

[1] All loan payments are based upon the Cash Collateral Motion through October 2013. In Nov 2013 loans restructured to 5.25% interest with 30 YR term and various amortization years included in these amounts.

[2] Bankruptcy legal fees & US Trustee Payments.

[3] Employee meals.

**Actual Statement of Cash Receipts Disbursements**
**For May 2013 thru June 2013**

| ACTUAL | MTD May 2013 | CTD Cumulative (Case to Date) 5/31/2013 | MTD June 2013 | CTD Cumulative (Case to Date) 6/30/2013 | MTD July 2013 | CTD Cumulative (Case to Date) 7/31/2013 |
|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | |
| 1 Rent/Lease Collected | 500.00 | 500.00 | 500.00 | 1,000.00 | 500.00 | 1,500.00 |
| 2 Cash Received from Sales | 268,175.00 | 268,175.00 | 268,849.00 | 537,024.00 | 255,528.00 | 792,552.00 |
| 3 Interest Received | - | - | - | - | - | - |
| 4 Borrowings | - | - | - | - | - | - |
| 5 Funds from Shareholders, Partners or Other Outsiders | - | - | - | - | - | - |
| 6 Capital Contributions | - | - | - | - | - | - |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 Total Cash Receipts | 268,675.00 | 268,675.00 | 269,349.00 | 538,024.00 | 256,028.00 | 794,052.00 |
| **Cash Disbursements** | | | | | | |
| 13 Payments for Inventory | 22,692.31 | 22,692.31 | 74,791.67 | 97,483.98 | 45,413.57 | 142,897.55 |
| 14 Selling | 12,213.38 | 12,213.38 | 1,958.66 | 14,172.04 | 2,018.47 | 16,190.51 |
| 15 Administrative | 14,812.32 | 14,812.32 | 21,946.80 | 36,759.12 | 681.35 | 37,440.47 |
| 16 Capital Expenditures | - | - | - | - | - | - |
| 17 Principal Payments on Debt | 12,040.30 | 12,040.30 | 18,122.99 | 30,163.29 | 15,181.13 | 45,344.42 |
| 18 Interest Paid | 25,519.02 | 25,519.02 | 25,957.33 | 51,476.35 | 25,574.13 | 77,050.48 |
| Rent/Lease: | | | | | | |
| 19 Personal Property | 10,260.67 | 10,260.67 | 999.14 | 11,259.81 | 1,182.29 | 12,442.10 |
| 20 Real Property | - | - | - | - | - | - |
| Amount Paid to Owner(s)/Officer(s) | | | | | | |
| 21 Salaries | - | - | - | - | - | - |
| 22 Draws | - | - | - | - | - | - |
| 23 Commissions/Royalties | - | - | - | - | - | - |
| 24 Expense Reimbursements | - | - | - | - | - | - |
| 25 Other | - | - | - | - | - | - |
| 26 Salaries/Commissions (less employee withholding) | 67,605.78 | 67,605.78 | 76,912.27 | 144,518.05 | 74,396.60 | 218,914.65 |
| 27 Management Fees | 12,000.00 | 12,000.00 | 24,000.00 | 36,000.00 | 30,000.00 | 66,000.00 |
| Taxes: | | | | | | |
| 28 Employee Withholding | 5,988.53 | 5,988.53 | 7,191.22 | 13,179.75 | 18,548.91 | 31,728.66 |
| 29 Employer Payroll Taxes | 12,552.35 | 12,552.35 | 15,421.17 | 27,973.52 | 23,647.12 | 51,620.64 |
| 30 Real Property Taxes | - | - | - | - | - | - |
| 31 Gaming/Sales Taxes | 7,217.64 | 7,217.64 | 15,894.24 | 23,111.88 | 52,168.62 | 75,280.50 |
| 32 Other Cash Outflows: | | | | | | |
| 33 Other Operating Expenses | 23,623.25 | 23,623.25 | 8,379.44 | 32,002.69 | 189.94 | 32,192.63 |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 Total Cash Disbursements | 226,525.55 | 226,525.55 | 291,574.93 | 518,100.48 | 289,002.13 | 807,102.61 |
| 39 Net Increase(Decrease) in Cash | 42,149.45 | 42,149.45 | (22,225.93) | 19,923.52 | (32,974.13) | (13,050.61) |
| 40 Cash Balance, Beginning of Period | 14,668.51 | 14,668.51 | 56,817.96 | 71,486.47 | 34,592.03 | 106,078.50 |
| 41 Cash Balance, End of Period | 56,817.96 | 56,817.96 | 34,592.03 | 91,409.99 | 1,617.90 | 93,027.89 |

## Statement of Cash Receipts Disbursements
### For the Months August 2013 Through July 2014

| FORECAST | CTD Cumulative (Case to Date) 07/31/13 | MTD August 2013 | CTD Cumulative (Case to Date) 8/31/2013 | MTD September 2013 | CTD Cumulative (Case to Date) 9/30/2013 | MTD October 2013 | CTD Cumulative (Case to Date) 10/31/2013 | MTD November 2013 | CTD Cumulative (Case to Date) 11/30/2013 | MTD December 2013 | CTD Cumulative (Case to Date) 12/31/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | |
| 1 Rent/Lease Collected | 1,500 | 500 | 2,000 | 500 | 2,500 | 500 | 3,000 | 500 | 3,500 | 500 | 4,000 |
| 2 Cash Received from Sales | 791,898 | 286,500 | 1,078,398 | 267,700 | 1,346,098 | 304,500 | 1,650,598 | 292,200 | 1,942,798 | 268,700 | 2,211,498 |
| 3 Interest Received | | | | | | | | | | | |
| 4 Borrowings | | | | | | | | | | | |
| 5 Funds from Shareholders, Partners or Other Outsiders | | | | | | | | | | | |
| 6 Capital Contributions | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 **Total Cash Receipts** | 793,398 | 287,000 | 1,080,398 | 268,200 | 1,348,598 | 305,000 | 1,653,598 | 292,700 | 1,946,298 | 269,200 | 2,215,498 |
| **Cash Disbursements** | | | | | | | | | | | |
| 13 Payments for Inventory | 142,898 | 54,000 | 196,898 | 54,000 | 250,898 | 46,000 | 296,898 | 69,750 | 366,648 | 56,000 | 422,648 |
| 14 Selling | 28,622 | 11,000 | 39,622 | 12,000 | 51,622 | 15,000 | 66,827 | 15,474 | 82,301 | 15,974 | 98,275 |
| 15 Administrative | 30,328 | 9,051 | 39,379 | 22,700 | 62,079 | 26,675 | 88,754 | 25,542 | 114,296 | 21,150 | 135,446 |
| 16 Capital Expenditures | 45,454 | 18,902 | 64,356 | 16,823 | 81,179 | 17,293 | 98,472 | 17,249 | 115,721 | 15,275 | 130,996 |
| 17 Principal Payments on Debt | | | | | | | | | | | |
| 18 Interest Paid | 77,050 | 25,738 | 102,788 | 25,701 | 128,489 | 25,341 | 153,830 | 27,552 | 181,382 | 27,520 | 208,903 |
| **Rent/Lease:** | | | | | | | | | | | |
| 19 Personal Property | | | | | | | | | | | |
| 20 Real Property | 12,442 | 1,182 | 13,624 | 1,029 | 14,653 | 1,029 | 15,682 | 1,029 | 16,710 | 1,029 | 17,739 |
| **Amount Paid to Owner(s)/Officer(s)** | | | | | | | | | | | |
| 21 Salaries | | | | | | | | | | | |
| 22 Draws | | | | | | | | | | | |
| 23 Commissions/Royalties | | | | | | | | | | | |
| 24 Expense Reimbursements | | | | | | | | | | | |
| 25 Other | | | | | | | | | | | |
| 26 Salaries/Commissions (less employee withholding) | 218,915 | 77,429 | 296,344 | 77,000 | 373,344 | 88,000 | 461,344 | 77,000 | 538,344 | 77,000 | 615,344 |
| 27 Management Fees | 66,000 | 24,000 | 90,000 | 3,000 | 93,000 | | 93,000 | | 93,000 | | 93,000 |
| **Taxes:** | | | | | | | | | | | |
| 28 Employee Withholding | 31,729 | 15,000 | 46,729 | 15,000 | 61,729 | 18,549 | 80,278 | 15,000 | 95,278 | 15,000 | 110,278 |
| 29 Employer Payroll Taxes | 51,621 | 7,000 | 58,621 | 7,000 | 65,621 | 20,251 | 85,872 | 7,000 | 92,872 | 7,000 | 99,872 |
| 30 Real Property Taxes | | 5,067 | 5,067 | | 5,067 | 5,067 | 10,133 | | 10,133 | 5,067 | 15,200 |
| 31 Gaming/Sales Taxes | 75,281 | 19,300 | 94,581 | 19,300 | 113,881 | 19,300 | 133,181 | 20,060 | 153,241 | 20,060 | 173,301 |
| 32 Other Cash Outflows: | | | | | | | | | | | |
| **Other Operating Expenses** | | | | | | | | | | | |
| 34 | 26,015 | 10,500 | 36,514 | 21,537 | 58,051 | 13,496 | 71,547 | 19,544 | 91,091 | 14,125 | 105,217 |
| 35 | | | | | | | | | | | |
| 36 | | | | | | | | | | | |
| 37 | | | | | | | | | | | |
| 38 **Total Cash Disbursements** | 806,449 | 278,169 | 1,084,616 | 275,200 | 1,359,816 | 296,000 | 1,655,816 | 295,200 | 1,951,016 | 275,200 | 2,226,216 |
| 39 Net Increase/(Decrease) in Cash | (13,051) | 8,832 | (4,219) | (7,000) | (11,219) | 9,000 | (2,219) | (2,500) | (4,719) | (6,000) | (10,719) |
| 40 Cash Balance, Beginning of Period | 106,079 | 1,168 | 107,696 | 10,000 | 117,696 | 3,000 | 120,696 | 12,000 | 132,696 | 9,500 | 142,196 |
| 41 Cash Balance, End of Period | 93,028 | 10,000 | 103,028 | 3,000 | 106,028 | 12,000 | 118,028 | 9,500 | 127,528 | 3,500 | 131,028 |

## Statement of Cash Receipts Disbursements
### For the Months August 2013 Through July 2014

| MTD January 2014 | CTD Cumulative (Case to Date) 1/31/2014 | MTD February 2014 | CTD Cumulative (Case to Date) 2/28/2014 | MTD March 2014 | CTD Cumulative (Case to Date) 3/31/2014 | MTD April 2014 | CTD Cumulative (Case to Date) 4-31-14 | MTD May 2014 | CTD Cumulative (Case to Date) 5/31/2014 | MTD June 2014 | CTD Cumulative (Case to Date) 6/30/2014 | MTD July 2014 | CTD Cumulative (Case to Date) 7/31/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500 | 4,500 | 500 | 5,000 | 500 | 5,500 | 500 | 6,000 | 500 | 6,500 | 500 | 7,000 | 500 | 7,500 |
| 266,800 | 2,477,798 | 258,000 | 2,735,798 | 302,500 | 3,038,298 | 253,500 | 3,291,798 | 268,200 | 3,559,598 | 268,500 | 3,828,498 | 255,500 | 4,081,998 |
| 266,800 | 2,482,298 | 258,500 | 2,740,798 | 303,000 | 3,043,798 | 254,000 | 3,297,798 | 268,700 | 3,556,498 | 269,000 | 3,835,498 | 256,000 | 4,031,498 |
| 30,264 | 452,911 | 49,500 | 502,411 | 60,000 | 562,411 | 50,000 | 612,411 | 55,000 | 667,411 | 43,500 | 710,911 | 38,255 | 749,166 |
| 14,974 | 113,249 | 14,974 | 128,223 | 15,974 | 144,197 | 15,974 | 160,171 | 9,974 | 170,145 | 15,974 | 186,519 | 10,574 | 197,093 |
| 1,139 | 146,689 | 18,403 | 165,041 | 27,194 | 192,235 | 4,143 | 196,378 | 11,568 | 207,646 | 11,588 | 232,385 | 11,382 | 243,767 |
| 17,312 | 148,300 | 15,339 | 163,647 | 13,537 | 179,011 | 15,003 | 194,420 | 17,440 | 211,861 | 15,468 | 227,329 | 17,505 | 244,834 |
| 27,489 | 236,391 | 27,457 | 263,848 | 27,424 | 291,273 | 27,393 | 318,566 | 27,580 | 346,015 | 27,339 | 373,354 | 27,295 | 400,649 |
| 1,029 | 18,767 | 1,029 | 19,796 | 1,029 | 20,825 | 1,029 | 21,853 | 1,029 | 22,882 | 1,029 | 23,910 | 1,059 | 24,939 |
| 88,000 | 703,344 | 77,000 | 780,344 | 77,000 | 857,344 | 77,000 | 934,344 | 90,000 | 1,024,344 | 79,000 | 1,103,344 | 86,000 | 1,189,344 |
|  | 93,000 |  | 93,000 |  | 93,000 |  | 93,000 |  | 93,000 |  | 93,000 |  | 93,000 |
| 18,549 | 128,826 | 15,000 | 143,826 | 15,000 | 158,826 | 15,000 | 173,826 | 19,276 | 193,102 | 16,000 |  | 17,500 | 226,602 |
| 20,250 | 120,122 | 7,000 | 127,122 | 7,000 | 134,122 | 18,000 | 152,122 | 8,350 | 161,072 | 7,500 | 168,572 | 20,000 | 188,572 |
| 20,060 | 15,200 | 20,060 | 213,421 | 15,067 | 15,067 | 20,080 | 20,266 | 20,266 | 20,266 | 20,660 |  | 17,060 | 20,266 |
| 18,182 | 193,361 | 13,239 | 136,637 | 20,060 | 233,483 | 13,699 | 253,541 | 20,560 | 273,601 | 21,903 | 293,661 | 10,500 | 310,721 |
|  | 123,398 |  |  | 22,882 | 159,519 |  | 173,018 | 9,848 | 182,850 |  | 204,763 |  | 215,263 |
| 267,300 | 2,493,516 | 259,000 | 2,752,516 | 284,000 | 3,046,516 | 257,500 | 3,304,016 | 270,206 | 3,574,216 | 272,500 | 3,846,716 | 257,500 | 4,104,216 |
| (500) | (11,218) | (500) | (11,715) | 9,000 | (2,719) | (3,500) | (6,219) | (1,500) | (7,719) | (3,600) | (11,219) | (1,900) | (12,719) |
| 5,500 | 145,696 | (3,000) | 148,696 | 2,500 | 151,196 | 11,500 | 162,696 | 9,000 | 170,696 | 9,500 | 180,196 | 6,000 | 185,196 |
| 3,000 | 134,028 | 2,500 | 136,528 | 11,500 | 148,028 | 3,000 | 156,028 | 7,500 | 163,528 | 6,000 | 169,528 | 4,500 | 174,028 |

# EXHIBIT "B"

B6G (Official Form 6G) (12/07)

In re: __THE HOLDER GROUP SHARKEY'S, LLC_____ ,     Case No. __13-50844-BTB__
                                       Debtor                                              (If known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY.  STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| AMERIPRIDE SERVICES, INC. 78620 WILBUR WAY SACRAMENTO, CA  95828 | 36 MONTH LEASE FOR LINEN SERVICE COMMENCED 6/9/11.  MONTHLY PAYMENT OF APPROXIMATELY $325. |
| BALLY GAMING, INC. LOCKBOX 749335 LOS ANGELES, CA 90074 | SLOT MACHINE LEASE |
| BALLY GAMING, INC. BALLY TECHNOLOGIES LOCKBOX 749335 LOS ANGELES, CA  90074 | LEASE FOR FOUR SLOT MACHINES AT $19.58/DAY.  THIS IS A 36 MONTH LEASE WITH $1 BUYOUT AT END.  THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |
| BMI 10 MUSIC SQUARE EAST NASHVILLE, TN  37203 | MUSIC LICENSE AGREEMENT FOR ONE YEAR PERIOD WITH AUTO RENEWAL SINCE 11/2007, WITH 30 DAY NOTICE REQUIRED FOR CANCELLATION.  ANNUAL FEE IS $465. |
| FRONTIER P.O. BOX 20550 ROCHESTER, NY 14602 | MONTH TO MONTH TELEPHONE SERVICE CONTRACT FOR $435.65/MONTH.  30 DAYS NOTICE REQUIRED FOR CANCELLATION. |
| IGT 9295 PROTOYPE DRIVE RENO, NV 89511 | MICROSOFT END-USE LICENSE AGREEMENT. |
| IGT P.O. BOX 887866 LOS ANGELES, CA  90088 | ROYALTY AGREEMENT FOR MULTI-HAND POKER MACHINES AT $20/DAY FOR 1 MACHINE, WITH REMAINING 6 MACHINES AT $15/DAY.  CONTRACT IS TERMINATED BY RETURN OF ALL MACHINES. |
| IGT P.O. BOX 887866 LOS ANGELES, CA  90088 | MONTH TO MONTH SLOT PARTICIPATION AGREEMENT. FEE IS 20% OF NET WIN OR $20/DAY PER MACHINE, WHICHEVER IS GREATER. THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |

B6G (Official Form 6G) (12/07) -Cont.

In re: __THE HOLDER GROUP SHARKEY'S, LLC_____,    Case No. __13-50844-BTB__
　　　　　　　　　　　　　　　Debtor　　　　　　　　　　　　　　　　　　　　(If known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| KONAMI GAMING<br>585 TRADE CENTER DRIVE<br>LAS VEGAS, NV 89119 | SALES & SECURITY AGREEMENT FOR SLOT ACCOUTNING & PLAYERS CLUB SYSTEM. |
| KONAMI GAMING<br>585 TRADE CENTER DRIVE<br>LAS VEGAS, NV 89119 | MONTHLY SYSTEM SUPPORT CONTRACT AT $922.25/WEEK. |
| NEVADA NOVELTY<br>2195 CHAROLAISE CIRCLE<br>SPARKS, NV 89431 | ATM, CIGARETTE MACHINE AND JUKEBOX LEASE. $1.00 COMMISSION ON ATM TRANSACTIONS, $.50 COMMISSION ON CIGARETTE SALES AND 10% COMMISSION ON JUKEBOX. |
| PAYROLL SYSTEMS OF NEVADA<br>4874 SPARKS BLVD.<br>SPARKS, NV 89436 | MONTH TO MONTH PAYROLL SERVICES CONTRACT. FEE BASED ON PAYROLL. THIRTY DAYS NOTICE REQUIRED FOR CANCELLATION. |
| PDS GAMING CORPORATION<br>6280 ANNIE OAKLEY DRIVE<br>LAS VEGAS, NV 89120-3910 | SLOT MACHINE LEASE AGREEMENT FOR $15/DAY PER MACHINE. 6 MONTH RENEWABLE CONTRACT. |
| PDS GAMING CORPORATION<br>6280 ANNIE OAKLEY DRIVE<br>LAS VEGAS, NV 89120-3910 | SLOT MACHINE LEASE AGREEMENT AT $10 TO $15/DAY PER MACHINE DEPENDING ON GAME TYPE. |
| RADIANT SYSTEMS<br>3925 BROOKSIDE PARKWAY<br>ALPHARETTA, GA 30022 | MONTH TO MONTH SERVICE AGREEMENT ON POINT OF SALE PROGRAM WITH MONTHLY PAYMENT OF $691.74. THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |
| RENT-A-CUBE<br>P.O. BOX 397<br>MINDEN, NV 89423 | MONTH TO MONTH LEASE FOR STORAGE SPACE AT $260.00 PER MONTH. THIRTY DAYS NOTICE REQUIRED FOR CANCELLATION. |