STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| IN RE: | Case No. 13-50844-btb |
| THE HOLDER GROUP SHARKEY'S, LLC, | (Chapter 11) |
| | **DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION** |
| Debtor. | Hearing Date: November 19, 2013 |
| | Hearing Time: 3:00 p.m. |
| _____ / | Est. Time: 2 hrs |
| | Set By: Calendar Clerk |

**THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company**, Debtor and Debtor-in-Possession ("Debtor") in the above-captioned Chapter 11 reorganization case, pursuant to 11 U.S.C. § 1121(a), hereby proposes the following **DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION**, by and through its attorney STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, and requests confirmation thereof pursuant to the provisions of 11 U.S.C. § 1129(a) and (b).

ARTICLE I.

INTRODUCTION

This DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION is proposed by THE HOLDER GROUP SHARKEY'S, LLC, Debtor and Debtor-in-Possession herein, for the resolution of the Debtor's outstanding creditor obligations. DEBTOR'S FIRST AMENDED

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

1

PLAN OF REORGANIZATION (the "PLAN") is offered pursuant to Chapter 11 of Title 11 of the United States Code, and should be read in conjunction with DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT as amended by the FIRST AMENDMENT TO DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") concerning this Debtor that will be approved by the United States Bankruptcy Court.

Along with this proposed Plan, creditors will receive a Disclosure Statement which has been approved by the United States Bankruptcy Court. The Court has determined that the Disclosure Statement is adequate to enable creditors to make an informed judgment on whether to accept or reject the Plan. The Disclosure Statement fully sets forth the Debtor's background information, an analysis of the Debtor's financial position and a summary of this Plan. The Debtor has not authorized any statement or representation, such as the value of its property or the amount of its creditors' claims, that is not contained in the Court approved Disclosure Statement.

Information as to the procedures relating to approval, confirmation and consummation of the Plan may be obtained from STEPHEN R. HARRIS, ESQ. of the law firm HARRIS LAW PRACTICE LLC, attorneys for the Debtor, upon written request.

THE PROVISIONS OF THE CONFIRMED PLAN WILL LEGALLY BIND THE DEBTOR AND ITS CREDITORS, REGARDLESS OF WHETHER THEY HAVE FILED CLAIMS OR HAVE ACCEPTED THE PLAN. Creditors should thoroughly review both the Plan and the Disclosure Statement before determining whether to accept or reject the proposed Plan.

ARTICLE II.
DEFINITIONS

SCOPE OF DEFINITIONS.

For the purposes of this PLAN, all capitalized terms and otherwise defined terms shall have the meanings assigned to them in this Article II. Whenever the context requires, such terms shall include the plural number as well as the singular and the female and/or masculine gender as well as the neuter.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

2

1.     "ADMINISTRATIVE CLAIM."  This term shall refer to and mean every claim that is entitled to allowance under Section 503(b) of the Bankruptcy Code or otherwise entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, arising prior to the Effective Date, including, without limitation: **(a)** any actual, necessary expense preserving the Estate, including, without limitation, expenses necessary or appropriate to carry out, facilitate, or effectuate this Plan; **(b)** any amount required to be paid under Section 365(b) of the Bankruptcy Code in connection with the curing of defaults under executory contracts or unexpired leases; and **(c)** all allowances, including professional fees and costs, approved by the Bankruptcy Court for the Receiver and his professionals, and the Debtor's professionals and members of and professionals employed by the Unsecured Creditors' Committee, if any.

2.     "ALLOWED  ADMINISTRATIVE  CLAIM"  shall mean an Administrative Claim:  **(a)** as to which no objection has been filed or, if an objection has been filed, such objection has been resolved by the allowance of such Administrative Claim by a Final Order; **(b)** which requires payment in the ordinary course of the business of the Debtor and as to which there is no order of the Bankruptcy Court in effect which prohibits any such payment; or **(c)** which requires payment pursuant to a Final Order.

3.     "ALLOWED CLAIM" or "ALLOWED INTEREST" shall mean claims against or interest in the Debtor to the extent that--

(a) Proof of claim or interest was–

(I)  timely filed;

(ii)  deemed filed, if such claim or interest appears in the schedules filed herein, unless such claim or interest is scheduled as disputed, contingent, or unliquidated; or

(iii)  late filed–

(I)  with leave of the Bankruptcy Court; or

(II)  without objection by the Debtor-in-Possession within a time fixed by the Bankruptcy Court; and

(b) (I)  the Debtor-in-Possession does not file an objection within a time fixed by the Bankruptcy Court; or

(ii)  the claim or interest is allowed by a Final Order; or

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

3

(iii) the claim or interest is allowed under this PLAN.

4.    "ALLOWED PRIORITY CLAIM" shall mean a Priority Claim which is an Allowed Claim.

5.    "ALLOWED SECURED CLAIM" shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under Section 553 of the Code, to the extent of the value (determined in accordance with Section 506(a) of the Code) of the interest of the holder of such Allowed Claim in the Debtor's interest in such property or to the extent of the amount subject to such set-off, as the case may be.

6.    "ALLOWED SUBORDINATED CLAIM" shall mean an Allowed Claim arising from any Indebtedness evidenced by or related to the claim of a Subordinated Creditor.

7.    "DEFINITION OF THE BALLOT" shall mean the Ballot(s) for accepting or rejecting this Plan in a form(s) approved by the Bankruptcy Court.

8.    "BANKRUPTCY CODE" as used herein refers to Title I of Public Law No. 95-598, as codified in Title 11 of the United States Code, and all amendments thereto.

9.    "BANKRUPTCY COURT" (or "COURT") shall mean the United States Bankruptcy Court, for the District of Nevada (Reno, Nevada), in which the Debtor's Chapter 11 case is pending, such other court as has jurisdiction in its Chapter 11 case, and any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom.

10.    "BANKRUPTCY RULES" shall mean the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, including any amendments thereto, which are in effect before and as of the Confirmation Date, and thereafter during the Reorganization Case, to the extent that they are consistent with vested rights under this Plan and the Confirmation Order.

11.    "BUSINESS DAY" shall mean any day except Saturday, Sunday, or a day on which commercial banks in Washoe County, Nevada, are authorized or required by law to close.

12.    "CLAIM" shall mean: (a) any right to payment from the Debtor or its Estate, including an Administrative Claim, whether or not such right is reduced to judgment, or is

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

4

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; and **(b)** any right to an equitable remedy for breach of performance of such breach gives rise to a right to payment from the Debtor or its Estate, including an Administrative Claim, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, secured or unsecured.

13.    "CLAIMANT" shall mean the holder of an Allowed Claim or an Allowed Administrative Claim.

14.    "CLASS" shall mean any class into which Allowed Claims or Allowed Interests are classified pursuant to Article IV.

15.    "COMMENCEMENT DATE" (or "PETITION DATE") shall mean the date the Debtor filed its Petition for Relief [April 30, 2013], which date shall be utilized to determine the cessation of interest on certain claims and the date of commencement of the rights of certain creditors to make claim for administrative expenses and allowances, among other rights that are determined by relation to said date.

16.    "CONFIRMATION" shall mean the entry of the Confirmation Order by the United States Bankruptcy Court.

17.    "CONFIRMATION DATE" shall mean the date on which the Confirmation Order is entered on the Bankruptcy Court's docket.

18.    "CONFIRMATION ORDER" shall mean the Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code and approving the transactions contemplated herein, which shall be in form and substance acceptable to the proponents.

19.    "CREDITOR" shall mean any entity that has a claim against the Debtor, which claim arose to or before the order for relief concerning the Debtor, including any claim that may arise under 11 U.S.C. Sections 502(f), 502(g), 502(h) and 502(I).

20.    "DEBTOR" shall mean THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company, Debtor and Debtor-in-Possession herein.

21.    "DEBTOR'S ASSETS" shall mean all assets and property of every kind, nature and description of which the Debtor or its Estates have any right, title or interest, including but not limited to: real property, personal property, including but not limited to bank deposits, instruments, credit of instruments, certificates of deposit and drafts; all executory contracts which are not and have not been rejected; all choses in action; and all claims, demands, causes of action, damages and obligations of any nature whatsoever, known or unknown in law or in equity, including, without limitation, claims or causes of action arising under the Bankruptcy Code (including, without limitation, Sections 362, 510, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code), or under any Nevada statute or regulation.

22.    "DEBTOR'S PROFESSIONALS" shall mean STEPHEN R. HARRIS, ESQ., of the law firm of HARRIS LAW PRACTICE LLC, as Debtor's general bankruptcy counsel; and all other professionals retained by the Debtor with approval of the Bankruptcy Court, in accordance with Section 327 of the Bankruptcy Code.

23.    "DISCLOSURE STATEMENT" means the written DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT, as amended by the FIRST AMENDMENT TO DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT with respect to this Plan which is approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code.

24.    "DISPUTED CLAIM" shall mean every claim that is not an Allowed Claim or an Allowed Administrative Claim or to which the Debtor or the Unsecured Creditors' Committee or Receiver files an objection before the deadline for objection set forth in this Plan or an operative order of the Bankruptcy Court.

25.    "EFFECTIVE DATE of the PLAN" shall mean the first Business Day which is at least thirty (30) calendar days after all of the following have occurred (so long as they remain in effect):   (a) this Plan has been confirmed pursuant to the Confirmation Order and the Confirmation Order remains in full force and effect without material modification thereof; (b) there is not in effect any stay, injunction or restraining order or any other order of any kind which has been issued by a Court of competent jurisdiction or other governmental entity staying, restricting or prohibiting the effectuation of this Plan; and (c) there is not in effect any

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

6

statute, rule, regulation or order enacted, promulgated or entered which is applicable to the effectuation of this Plan of which results in the consequences referred to in subsection (b) immediately above.

26. "EQUITY HOLDINGS" shall mean the Debtor's equity members' interests retained in the PLAN, after payment of all allowed creditors' claims.

27. "ESTATE" shall mean the Estate created in the Reorganization Case pursuant to Section 541 of the Bankruptcy Code.

28. "EXPIRATION DATE" shall mean the last date determined by the Bankruptcy Court for the casting of Ballots, which date shall be acceptable to the proponents.

29. "FINAL ORDER" shall mean a final order, judgment or other decree of the Bankruptcy Court or other Court of competent jurisdiction which has not been vacated, reversed, saved, modified or amended **(a)** as to which **(i)** the time to appeal or seek review or rehearing has expired and as to which no appeal, petition for certiorari, request for review or rehearing is pending, or **(ii)** if appeal, review, rehearing or certiorari of the order has been sought, the order has been affirmed or the request for review, rehearing or certiorari has been denied, the time to seek a further appeal, review, rehearing or certiorari has expired, and **(b)** as a result of which such orders shall become final and not appealable in accordance with applicable law.

30. "LIEN" shall mean a charge or encumbrance against or interest in property of the Debtor or the Estate to secure the payment of a debt or performance of an obligation, and includes any right of setoff under Section 553 of the Bankruptcy Code.

31. "PERSON" includes individual, partnership, corporation, association, joint stock company, joint venture, estate, trust, unincorporated organization, any governmental unit or political subdivision thereof, or other entity, and all of the respective heirs, personal representatives, successors and assigns.

32. "PETITION DATE" shall mean April 30, 2013, the date on which a Petition for Relief under Chapter 11 of the Bankruptcy Code was filed by the Debtor commencing a reorganization case.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

33. "PLAN" means the DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION, in the form filed by the proponent and any amendments or modifications thereof or supplements thereto filed by the proponent and permitted by Article X hereof or the Bankruptcy Court .

34. "PRIORITY CLAIM" shall mean a claim entitled to priority under Section 507(a)(2)-(8) of the Bankruptcy Code.

35. "PROPONENT" shall mean the Debtor acting as the proponent of this Plan.

36. "*PRO RATA* SHARE" shall mean the proportion that an Allowed Claim in a particular class bears to the aggregate amount of all Allowed Claims in such class.

37. "PURCHASER" shall mean the transferee of a voluntary transfer.

38. "RECORD DATE" shall mean, for purposes of voting, the date of entry by the Bankruptcy Court of the Order Approving the Disclosure Statement and, for purposes of distribution, the Confirmation Date.

39. "REORGANIZATION CASE" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code, which is currently pending before the Bankruptcy Court as Case No. 13-50844-btb.

40. "REORGANIZED DEBTOR" shall mean THE HOLDER GROUP SHARKEY'S, LLC, a Nevada limited liability company, Debtor and Debtor-in-Possession, on and after the Effective Date of the PLAN.

41. "SECURED CLAIM" shall mean the claims of note holders and, for purposes of this Plan, any other claim secured by a lien which is valid, perfected, enforceable and not avoidable.  If the value of the creditors' interest and the Estate's interest in the property securing a claim is not sufficient to satisfy such claim, then in accordance with Section 506 of the Bankruptcy Code and subject to Section 1111(b) of the Bankruptcy Code, such claim shall be deemed to be an unsecured claim under this Plan to the extent of any insufficiency in the value of the creditors' interest.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

8

42.    "UNSECURED CLAIM" shall mean any claim which is not a Secured Claim, Priority Claim, Administrative Claim, or an unclassified claim or the kind described in Section 507(a)(7) of the Bankruptcy Code.

43.    "UNSECURED CREDITORS' COMMITTEE" means the Unsecured Creditors' Committee appointed by the Bankruptcy Court in this Reorganization Case, if any, as modified by the addition or removal of members from time to time by the Bankruptcy Court.

A term used in this PLAN that is not defined in this PLAN but that is used in the Bankruptcy Code has the meaning assigned to the term.

ARTICLE III.

ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

**ADMINISTRATIVE CLAIMS:** All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtor's estate, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. § 507(a)(1) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date of the Plan.  The holders of these claims include the attorneys and accountants for the Debtor, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee.   The estimated administrative expenses for the Debtor's reorganization proceedings are from $100,000.00 up to $200,000.00, and consist of:

$0.00            Trustees fees that are owed the U.S. Trustee's Office for the
                 applicable quarters of 2013 prior to plan confirmation
                 [payment is anticipated to be made when due];

$100,000.00   Estimated professional fees for the Debtor's general bankruptcy
                 attorney, Stephen R. Harris, Esq., of HARRIS LAW PRACTICE LLC,
                 calculated as of the date of confirmation (estimated at $200,000.00
                 for a contested confirmation hearing and $100,000.00 for an
                 uncontested confirmation hearing);

$0.00            Post-petition accounts payable with [all post-petition
                 administrative expenses are expected to be paid in full in the
                 normal course of business prior to confirmation].

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

9

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

<u>UNCLASSIFIED PRIORITY TAX CLAIMS</u>:

1. **Description**. The Debtor's priority tax claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|------|------------------|-----------------------|-------------------------|
| Douglas County Treasurer | 10,261.87 | | $0 |
| Internal Revenue Service | $10,732.96 | $11,745.46 | $11,745.46 |
| Nevada Department of Taxation | $5,476.07 | | $0 |
| **Total:** | $26,470.90 | | $11,745.46 |

Pursuant to the Debtor's Plan, the treatment and disposition of the unclassified priority tax claims, if any, will be as follows: Any claim discrepancy will be resolved by the claim objection process, with the stipulated amount and/or Court decreed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtor.   All unclassified priority tax creditors, if any, shall be paid 100% of their allowed claim amount, with statutory interest thereon, on or before the Effective Date of the Plan.  In the event the Debtor fails to make the payments as set forth hereinabove, the allowed priority tax creditors, if any, shall have the right to proceed with any administrative remedies available to them, fifteen (15) days after written notice of default has been given to the Debtor and its attorney, Stephen R. Harris, Esq.

ARTICLE IV.
<u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

Pursuant to Section 1122 of the Bankruptcy Code, claims against the estate have been divided into the following classifications for purposes of administration and voting on the Plan:

1A.   <u>CLASS 1A SECURED CLAIM [NEVADA STATE BANK]</u>:  This Class consists of the secured claim of NEVADA STATE BANK as successor in interest to GREAT BASIN BANK OF NEVADA ("NSB"), in the approximate unpaid principal sum of $1,638,789.79 , plus accruing interest at the contractual rate, calculated as of the Petition Date.  The Class 1A

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

10

claim of NSB is secured by a first priority deed of trust recorded against the real property commonly described as APN 1320-33-401-15 through 16, 18 and 1320-33-401-029 through 032, on which the Sharkey's Casino is located. NSB also claims a security interest as described in the UCC-1 filed with the Nevada Secretary of State on January 15, 2009, as document number 2009001211-9 on behalf of Great Basin Bank of Nevada, which claims interest in "Gaming devices (as defined in NRS 463.0155) and associated equipment (as defined in NRS 463.0136) of said gaming devices, including, but not limited to the devices listed on Exhibit 1 hereto and their associated equipment, whether now owned or hereafter acquired for use at the real property described in Exhibit 2 hereto and, and all accession, additions, replacements substitutions, income, revenue and proceeds from the foregoing." (Exhibits omitted herein.) While the UCC-1 filing of NSB claims an interest in the income derived from the gaming devices, it is questionable under Nevada law as to whether it is entitled to that claim, as it is not a licensed gaming entity.

     1B.  <u>CLASS 1B SECURED CLAIM [NEVADA STATE BANK]</u>.  This Class consists of the secured claim of NSB created as a result of the modification of the Class 1A claim of NSB in the original principal balance of $59,790.61, with a current unpaid balance of approximately $48,190.52, which is secured on the same real and personal property as the Class 1A claim.

     2.  <u>CLASS 2 SECURED CLAIM [SEE HORSE 1, LLC]</u>:  This Class consists of the secured claim of SEE HORSE 1, LLC ("SH1"), as the assignee of Umpqua Bank, who was the successor in interest to Nevada Security Bank, which was the successor in interest to Northern Nevada Bank, in the approximate unpaid principal sum of $3,796,756.64 , plus accruing interest at the contractual rate, calculated as of the Petition Date.  The Class 2 secured claim of SH1 is secured by a second priority deed of trust recorded against the real property commonly described as APN 1320-33-401-15 through 16, 18 and 1320-33-401-029 through 032, on which the Sharkey's Casino is located.  SH1 also claims a security interest, as the successor to Umpqua Bank, in the personal property located on the Debtor's premises pursuant to a UCC-1 filed on behalf of Umpqua Bank on October 4, 2011, as document number 2011026392-4, with

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

11

the Nevada Secretary of State. SH1 has not refiled a UCC-1 on its own behalf. The Debtor disputes the amount claimed as owed by SH1.

3A.    CLASS 3A SECURED CLAIM [CITY NATIONAL BANK]:    This Class consists of the secured claim of City National Bank, as the successor in interest to Business Bank of Nevada in the approximate unpaid principal sum of $102,804.18, plus accruing interest at the contractual rate, calculated as of the Petition Date. The Class 3A claim of City National Bank is secured by a first priority interest in the real property commonly described as APN1320-33-401-017.

3B.    CLASS 3B SECURED CLAIM [CITY NATIONAL BANK]:    This Class consists of the secured claim of City National Bank as successor in interest to Business Bank of Nevada in the approximate unpaid principal sum of $102,746.53, plus accruing interest at the contractual rate, calculated as of the Petition Date. The Class 3B claim of City National Bank is secured by a first priority interest in the real property commonly described as APN1320-33-401-033.

4A.    CLASS 4A SECURED CLAIM [PDS GAMING CORPORATION, NEVADA]: This Class consists of the secured interest of PDS GAMING CORPORATION – NEVADA (PDS) in gaming equipment leased to the Debtor by PDS evidenced by two UCC-1 Financing Statements filed as Document Nos. 2012010932-4 and 201231164-0 with the Nevada Secretary of State, each of which in addition to identifying certain gaming equipment, and all other equipment leased or to be leased under the Lease Agreements and also claiming an interest in and to "1) all security deposits, holdbacks, reserves and other monies belonging or payable to lessee in connection with the Lease and the Equipment; 2) all accounts, chattel paper, contract rights, documents, equipment, fixtures, general intangibles (patents, copyrights, trade names and trademarks), goods, instruments and inventory pertaining to the lease and the lease equipment; 3) all accessions, accessories, additions, amendments, attachments, modifications, replacements and substitutions to any of the foregoing; 4) all proceeds and products of any of the foregoing; (5) all policies of insurance pertaining to any of the foregoing as well as any proceeds pertaining to such policies; and 6) all books and records pertaining to any of the foregoing".

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

12

4B.    CLASS 4B SECURED CLAIM [INTERNATIONAL GAME TECHNOLOGY]: This Class consists of the secured interest of INTERNATIONAL GAME TECHNOLOGY (IGT) in gaming equipment leased to the Debtor by IGT evidenced by two UCC-1 Financing Statements filed as Document Nos. 200900-6237-7 and 2009006246-6 each of which claims a security interest in certain gaming devices in the possession of the Debtor.

4C.    CLASS 4C SECURED CLAIM [NEVADA BANK & TRUST COMPANY]: This claim consists of the secured interest of NEVADA BANK & TRUST COMPANY (NBT) in gaming equipment purchased by the Debtor from KONAMI as evidenced a UCC-1 Financing Statement filed as Document No. 2010005772-3 with the Nevada Secretary of State, which claims a security interest in certain gaming devices in the possession of the Debtor.

4D.    CLASS 4D SECURED CLAIM [KONAMI GAMING INC.]:    This claim consists of the security interest held by Konami Gaming Inc., as evidenced by the Security Agreement executed and dated May 11, 2010 by the Debtors that is attached as Exhibit C to the First Amendment to the System Purchase and License Agreement of even date between Holder Hospitality Group and Konami Gaming, Inc., which encumbers gaming equipment located in the Debtor's casino.

5. CLASS 5 CLAIMS [ALLOWED GENERAL UNSECURED CREDITORS]:    This Class consists of all allowed unsecured claims against the Debtor and disputed claims to the extent disputed claims may be proven and allowed by the Court.  The Class 5 Allowed General Unsecured Claims as of the Petition Date totaled approximately $873,438.13, detailed as follows:

| CREDITOR CLAIMS | SCHEDULED AMOUNT | PROOF OF CLAIM AMOUNT | ALLOWED AMOUNT |
|---|---|---|---|
| A #1 CHEMICAL, INC | $466.67 | | $466.67 |
| ACE HARDWARE | $550.97 | | $405.25 |
| AMERIPRIDE SERVICES, INC. | $2,998.99 | Critical Vendor paid post-petition | $0.00 |
| BEST BREWED TEAS | $161.20 | Critical Vendor paid post-petition | $0.00 |
| BMI | $953.73 | $999.37 | $999.37 |

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

| | | | |
|---|---|---|---|
| C & M FOOD DISTRIBUTORS | $3,556.93 | Critical Vendor paid post-petition | $2,605.79 |
| CROWN BEVERAGES, INC | $540.49 | Critical Vendor paid post-petition | $0.00 |
| DMS DIRECT INC. | $532.05 | Critical Vendor paid post-petition | $0.00 |
| DYNASTY GAMES | $997.79 | Critical Vendor paid post-petition | $997.79 |
| FARMER BROS. COFFEE | $1,912.47 | Critical Vendor paid post-petition | $0.00 |
| FIREMANS FUND INSURANCE | $20,000.00 | | $20,000.00 |
| FRANCO FRENCH | $765.97 | Critical Vendor paid post-petition | $0.00 |
| INTERNAL REVENUE SERVICE | $0.00 | $2,727.23 | $2,727.23 |
| J W WELDING SUPPLY | $1,163.79 | | $1,163.79 |
| MILOS SHARKEY BEGOVICH LIVING TRUST DTD 5/2/02 | $760,391.50 Disputed | | $700,000.00 (allowance subject to 0% interest) |
| MINDEN & GARDNERVILLE SANITATION DISTRICT | $2,975.78 | Critical Vendor paid post-petition | $0.00 |
| MODEL DAIRY, INC | $2,031.51 | Critical Vendor paid post-petition | $0.00 |
| NEVADA RESTAURANT SUPPLY | $114.88 | | $0.00 |
| NEW WEST | $1,412.45 | Critical Vendor paid post-petition | $0.00 |
| PONDEROSA MEAT & PROVISIONS | $8,101.05 | Critical Vendor paid post-petition | $0.00 |
| SAGE BUSINESS WORKS | $868.85 | Critical Vendor paid post-petition | $868.85 |
| SCOLARI'S FOOD & DRUG | $73.99 | | $0.00 |
| SIERRA NEVADA MEDIA GROUP | $300.00 | | $0.00 |
| SIMPLEX GRINNELL | $432.12 | | $432.12 |
| SKILLMAN GROUP, LLC | $4,300.00 | | $4,300.00 |
| SOUTHERN WINE SPIRITS | $2,708.87 | Critical Vendor paid post-petition | $0.00 |
| STAPLES BUSINESS ADVANTAGE | $2,019.38 | Critical Vendor paid post-petition | $1,674.28 |
| STOR-ALL | $396.00 | | $0.00 |
| SWIRE COCA-COLA, USA | | | |

| | $2,842.00 | Critical Vendor paid post-petition 1,332.80 | $509.20 |
|---|---|---|---|
| TAVERN PRODUCTS INC | $836.25 | Critical Vendor paid post-petition | $0.00 |
| THE HOLDER GROUP SUNDANCE, LLC | $57,333.32 | | $87,333.32 |
| THE HOLDER GROUP, LLC | $66,783.21 | | $33,783.21 |
| TOWN OF GARDNERVILLE | $2,760.14 | Critical Vendor paid post-petition | $1,887.63 |
| US FOODS | $7,333.46 | Critical Vendor paid post-petition | $7,325.46 |
| WEDCO INC. | $961.31 | | $961.31 |
| WIRTZ BEVERAGE NV | $603.20 | Critical Vendor paid post-petition | $0.00 |
| **TOTALS** | **$960,180.32** | | **$866,553.64** |

6.  CLASS 6 EQUITY INTERESTS OF DEBTOR:  This Class consists of the members' equity interests in THE HOLDER GROUP SHARKEY'S, LLC, specifically: THE HOLDER GROUP, LLC as to a 100% membership interest.

ARTICLE V.

TREATMENT OF CLASSES

1A.    CLASS 1A SECURED CLAIM [NEVADA STATE BANK]:    The Class 1A secured Claim of NSB shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included, less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the 10th day of the month following the Confirmation Date, and continuing on the tenth day of each successive month for eight (8) years thereafter, with the entire amount of Modified Loan Balance to be paid eight (8) years after the Confirmation Date or upon sale of the Real Property, whichever occurs first in time.   Any payment due shall be subject to a fifteen

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

15

(15) day grace period to cure same.  The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.  Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002), and has been applied by this Court in previous confirmation hearings in early 2013.  Debtor shall provide evidence of payment of real property taxes and payment of insurance premiums to NSB within 10 days of paying same. Debtor shall maintain and provide proof of insurance naming NSB as an additional insured until such time as NSB is paid in full.   Accordingly, the Class 1A secured claim of NSB is impaired.

   1B. CLASS 1B SECURED CLAIM [NEVADA STATE BANK]:   The Class 1B secured claim of NSB shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included,  less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be repaid in equal payments of $2,200 per month with interest calculated at 5.25% on the principal balance, to be paid on or before the 10th day of each successive month until paid in full, commencing May, 2013. Any payment due shall be subject to a fifteen (15) day grace period to cure same.    The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.    Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013.  Debtor shall provide evidence of payment of real property taxes and payment of insurance premiums to NSB within 10 days of paying same. Debtor shall maintain and provide proof of insurance naming NSB as an additional insured until such time as NSB is paid in full. Accordingly, the Class 1B secured claim of NSB is impaired.

   2. CLASS 2 SECURED CLAIM [SEE HORSE 1, LLC]:  The Debtor disputes the Claim of See Horse 1, LLC., in that it believes the sale of the note to See Horse 1, LLC, was not an arm's length transaction, that the debt was acquired for substantially less than the face

amount of the note and contrary to FDIC guidelines for not purchases, and that See Horse 1, LLC, acquired the note with the intention of forcing the Debtor out of business. The Debtor is contemplating pursuit of litigation to expunge or decrease the secured claim of SH1. Within 90 days of September 21, 2013, the Debtor shall advise the Court and the parties in interest whether or not it will pursue that litigation, and if so, will provide a litigation budget, as well as designate the venue and whether or not special counsel shall be engaged to represent the Debtor in such litigation.

Without waiving its right to pursue litigation to expunge or decrease the Class 2 Secured Claim of SH1 as stated hereinabove, if not expunged, the Debtor shall treat the Class 2 Claim of SH1 as follows:

The Class 2 secured claim of SH1 shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance"). The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the twentieth day of the month following the Confirmation Date, and continuing on the twentieth day of each successive month for eight (8) years thereafter, with the entire amount of Modified Loan Balance to be paid eight (8) years after the Confirmation Date or upon sale of the Real Property, whichever occurs first in time. Any payment due shall be subject to a fifteen (15) day grace period to cure same. The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded. Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013. Accordingly, the Class 2 secured claim of SH1 is impaired.

3A.    CLASS 3A SECURED CLAIM [CITY NATIONAL BANK]:  The Class 3A claim of City National Bank shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included,  less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon the fifth day of the month following the Confirmation Date, and continuing on the fifth day of each successive month for four (4) years thereafter, with the entire amount of Modified Loan Balance to be paid four(4) years after the Confirmation Date or upon sale of the Real Property, whichever occurs first in time.    Any payment due shall be subject to a fifteen (15) day grace period to cure same.    The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.      Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013.  Accordingly, the Class 3A claim of City National Bank is impaired.

3B.    CLASS 3B SECURED CLAIM [CITY NATIONAL BANK]: The Class 3B claim of City National Bank shall retain its existing security interest and the outstanding loan balance shall be recalculated using the outstanding principal balance plus accrued interest at the non-default rate of interest from the Petition Date to the Confirmation Date, plus reasonable attorney's fees and collection costs, with no late fees to be included, less post-petition amounts paid to principal and interest by the Debtor ("Modified Loan Balance").  The Modified Loan Balance shall be paid in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization, commencing upon fifth day of the month following the Confirmation Date, and continuing on the fifth day of each successive month for four (4) years thereafter, with the entire amount of Modified Loan Balance to be paid four (4) years after the Confirmation Date or upon sale of the

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

18

Real Property, whichever occurs first in time.    Any payment due shall be subject to a fifteen (15) day grace period to cure same.    The Modified Loan Balance shall be deemed current as of the Confirmation Date and any Notice of Default shall be released and rescinded.    Debtor believes the interest rate proposed herein is appropriate based on the decision rendered in In re Till, 301F.3d 583,591 (2002) and has been applied by this Court in previous confirmation hearings in early 2013.    Accordingly, the Class 3B secured claim of City National Bank is impaired.

4A.    CLASS 4A SECURED CLAIM [PDS GAMING CORPORATION, NEVADA: The Class 4A secured claim of PDS shall be paid according to the existing terms and conditions of the secured lease.  Accordingly, the Class 4A claim of PDS is unimpaired under the Plan.

4B.    CLASS 4B SECURED CLAIM [INTERNATIONAL GAME TECHNOLOGY]: The Class 4B secured claim of IGT shall be paid according to the existing terms and conditions of the secured lease. Accordingly, the Class 4B claim of IGT is unimpaired under the Plan.

4C.    CLASS 4C SECURED CLAIM [NEVADA BANK & TRUST COMPANY]: The Class 4C Secured claim of Nevada Bank & Trust Company shall be paid according to the existing terms and conditions of the secured loan agreement. Accordingly, the Class 4C claim of Nevada Bank and Trust Company are unimpaired under the Plan.

4D.    CLASS 4D SECURED CLAIM [KONAMI GAMING INC.]: The Class 4D secured claim of Konami Gaming Inc., shall be paid pursuant to the terms of the Security Agreement executed and dated May 11, 2010 by the Debtors that is attached as Exhibit C to the First Amendment to the System Purchase and License Agreement of even date between Holder Hospitality Group and Konami Gaming, Inc.    Accordingly, the Class 4D claim of Konami Gaming Inc., is unimpaired under the Plan.

5. CLASS 5 CLAIMS [ALLOWED GENERAL UNSECURED CREDITORS]: The Class 5 Allowed General Unsecured Creditors, shall be paid 100% of their allowed claims by the Debtor, within eight (8) years of the Confirmation Date in monthly payments of principal and interest at the rate of 5.25% per annum accruing after the Confirmation Date, calculated on a thirty (30) year amortization until paid in full, with the exception of the claim of the MILOS

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

19

SHARKEY BEGOVICH LIVING TRUST DTD 5/2/02 ("Begovich Claim"), which is deemed an allowed general unsecured claim of $700,000.00, payable monthly at zero percent interest pursuant to the terms of the parties' promissory note, to be amortized over a thirty (30) year period, with monthly payments of approximately $1,944.00, and to be paid in full eight (8) years following the Confirmation Date. The Begovich Claim is the subject of litigation in the Ninth Judicial District Court, and pursuant to the Court's Order, copies of any settlement documents filed in that case shall be presented to all parties in interest. Accordingly, the Class 5 General Unsecured Claims are <u>impaired</u> under the Plan.

      6. <u>CLASS 6 EQUITY INTERESTS OF DEBTOR</u>: The equity interests of the members of THE HOLDER GROUP SHARKEY'S, LLC, existing on the Petition Date shall remain unchanged. Accordingly, the Class 6 interests of the Debtor are <u>unimpaired</u> under the Plan.

ARTICLE VI.

<u>TREATMENT OF EXECUTORY CONTRACTS, NON-EXECUTORY CONTRACTS,</u>

<u>UNEXPIRED LEASES AND DISPUTED CLAIMS</u>

1. <u>**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**</u>.

<u>Reservation of Rights</u>. The Debtor reserve the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtor. At this time, the Debtor is the Lessor to a sports book owned by Sierra Development Company dba Club Cal Neva that is located on its premises, in addition to being a party to the leases and executory contracts listed on the Debtor's Schedule G filed with this Court and attached hereto and incorporated herewith as **Exhibit "A"**. All of the Debtor's leases and executory contracts were entered into in the ordinary course of business and Debtor hereby assumes its lease with Sierra Development Company and all leases and executory contracts detailed in the attached **Exhibit "A"**.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

## 2. **DISPUTED CLAIMS**.

Through its Disbursing Agent, the Debtor will only make distributions according to the Plan and when their claims become allowed claims and interest as such terms are defined in the Plan. There are currently claims pending against the Debtor, either filed or scheduled, which are or will become Disputed Claims. As to some Disputed Claims, the Debtor disputes only the classification of the claims asserted by the holder. With respect to other Disputed Claims, the Debtor accepts the classification asserted by the holder but disputes the amount of the claim alleged by such holder. In some cases, the Debtor disputes both the asserted classification and the alleged amount. In addition, the Debtor and other parties in interest may object to certain other claims based upon equitable or contractual subordination pursuant to § 510 of the Bankruptcy Code. Specifically, such subordination claims may be asserted against any person or entity buying claim(s) for speculation and profit in Debtor's bankruptcy cases. No distribution will be made with respect to any such Disputed Claims unless and until they become allowed claims. THE HOLDER GROUP SHARKEY'S, LLC, disputes the following claims at this time: The Class 2 secured claim of Sec Horse 1, LLC and all but $700,000.00 of the Class 5 general unsecured claim of Milos Sharkey Bergovich.

ARTICLE VII.

STATEMENT OF IMPAIRMENT

There are six (6) classes impaired under the Plan, those being Class 1A, Class 1B, Class 2, Class 3A, Class 3B and Class 5. Classes 4A, 4B, 4C, 4D and Class 6 are unimpaired, and therefore are not entitled to vote.

ARTICLE VIII.

MEANS FOR EXECUTION OF THE PLAN

1. **Operations of Property, Advances from Guarantors and Disbursements.**

The Debtor is a duly licensed casino currently operating 138 gaming machines, and containing an independently operated sports book. While the Debtor's income decreased dramatically in 2010, steady increases in income have been posted for 2011 and 2012. It is anticipated that net income for 2013 will approximate that of 2009. The Debtor will have

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

21

sufficient cash flow from ongoing operations to sustain the debt service contained in the Plan. Attached hereto as Exhibit A and incorporated herein by that reference are the Comparison of Budget to Actual for May 2013 through July 2013, the Monthly Budget for May through July 2014, an Actual Statement of Cash Receipts and Disbursements for May 2013 through July 2013 and a Forecasted Statement of Cash Receipts and Disbursements August 2013 through July 2014 (collectively the "Budget").

2.    **Post-Confirmation Default**

In the event the Debtor becomes delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel.  The Debtor shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default.  In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon the real property (if a secured creditor) or take other appropriate action.  The Debtor shall have the right to bring the issue of default before the Bankruptcy Court.  At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to cure the default in a reasonable period of time.  The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

3.    **Professionals' Fees**

After the Confirmation Date of the Plan, the Debtor and any other professional, such as Debtor's general bankruptcy counsel, any special purpose counsel or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtor's professionals shall be at their normal hourly rate(s) and customary cost charges.

4.    **Distribution**

All cash proceeds shall be distributed in the foregoing  manner except amounts necessary to pay disputed claims against the Debtor in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

22

5.    **Taxes**

Unless otherwise provided in the Plan, all taxes are paid current and there are no tax liens on real or personal property owned by the Debtor.

ARTICLE IX.

MISCELLANEOUS PROVISIONS

1.    THE DISBURSING AGENT.

THE HOLDER GROUP SHARKEY'S, LLC, in its capacity as Debtor and Debtor-in-Possession, is ultimately responsible for making all distributions pursuant to the Plan.  To assist it in discharging those responsibilities, Debtor shall select a depository institution authorized by the Court for all funds which are to be sequestered for claims of creditors and ultimately distributed to creditors holding allowed claims.

2.    UNCLAIMED DISTRIBUTIONS.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to THE HOLDER GROUP SHARKEY'S, LLC.

3.    EFFECT OF CONFIRMATION.

Upon confirmation and performance of the Plan, THE HOLDER GROUP SHARKEY'S, LLC shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d).  In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the assets of THE HOLDER GROUP SHARKEY'S, LLC, including stay of default proceedings.

4.    EXCULPATION.

Neither the Unsecured Creditors' Committee, if any, nor Debtor nor any of its respective members, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan,

consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence, willful misconduct or fraud.

### ARTICLE X.

### MODIFICATION OF THE PLAN

The Debtor will have the right to modify this Plan in accordance with the provisions of the Bankruptcy Code and Chapter 11.  In this regard:

1.    In accordance with Section 1127(a) of the Bankruptcy Code and Chapter 11, and 11 U.S.C. § 1127(a), modification(s) of this Plan may be proposed in writing by the Debtor at any time(s) before their confirmation, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and Chapter 11, 11 U.S.C. §§ 1122 and 1123, and the Debtor complies with Section 1125 of the Bankruptcy Code and Chapter 11, and 11 U.S.C. § 1125.

2.    In accordance with Section 1127(b) of the Bankruptcy Code and Chapter 11, and 11 U.S.C. § 1127(b), this Plan also may be modified by the Debtor at any time(s) after its confirmation and before its substantial consummation, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and Chapter 11, 11 U.S.C. §§ 1122 and 1123; and provided further that the circumstances then existing justify such modification(s), and the Court confirms the Plan, as thus modified, under Section 1129 of the Bankruptcy Code and Chapter 11, 11 U.S.C. § 1129.

3.    Any holder(s) of a claim that has accepted or rejected the Plan will be deemed to have accepted or rejected, as the case may be, the Plan as modified unless, within the time fixed by the Court for doing so, such holder(s) changes its previous acceptance(s) or rejection(s).

4.    Every modification of this Plan will supersede the previous version(s) of the Plan as and whenever each such modification is effective as provided in this Article X.   When superseded, the previous version(s) of the Plan will be in the nature of withdrawn or rejected settlement proposal(s), and will be null, void, and unusable by the Debtor or any other party for any purpose(s) whatsoever with respect to any of the contents of such version(s) of the Plan.

## ARTICLE XI.

## DISCHARGE AND STAY CONTINUATION

Confirmation and performance of this Plan will discharge the Debtor from any and all debts dischargeable under Section 1141(d) of the Bankruptcy Code and Chapter 11, and 11 U.S.C. § 1141(d), and will otherwise have all effects provided in such Section 1141, which are not expressly inconsistent with the provisions of this Plan. Pending execution of this Plan and unless: (a) the Court has otherwise expressly ordered; or (b) this Plan otherwise expressly provides, all creditors will continue to be stayed from proceeding against the Debtor or their assets.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding confirmation of this Plan, the Court will retain jurisdiction for the following purposes, and each of them:

1. The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or by any other party in interest entitled to proceed in that manner. As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2. The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this Plan.

3. The Court will retain jurisdiction to facilitate the consummation of this Plan by entering, consistent with the provisions of this Plan, any further necessary or appropriate order(s) regarding the enforcement of this Plan and any provision(s) thereof.

4. The Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in this Plan, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtor may deem

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

25

1    it appropriate to initiate and prosecute in aid of its reorganization, and any "non-core

2    proceedings" accepted for consideration by this Court.

3       5.    The Court will retain jurisdiction to enter an appropriate final decree in this

4    Reorganization Case.

ARTICLE XIII.

FEASIBILITY OF DEBTOR'S PLAN

7       Sharkey's Casino is a small local casino in Gardnerville, Nevada, catering to local

8    patrons and patrons from the bordering communities in California, as well as some pass through

9    traffic.  Debtor believes that the PLAN is feasible based upon the improved income generated

10   from business operations over the past two years, coupled with the restructuring of the Debtor's

11   secured debt.  Additionally, Debtor has hired a more experienced General Manager, and since

12   that time the food operation has seen steady improvement, and the slot machines have been

13   upgraded and rearranged on the casino floor.   In spite of a slight decrease in gross receipts,

14   Debtor has shown a significant increase in its operating income or earnings before interest,

15   depreciation and amortization ("EBITDA") compared to 2012.  Indeed, for the first seven (7)

16   months of 2013, Debtor has exceeded 2012 actual EBITDA by 15%, with July 2012 reporting

17   year to date EBITDA of $500,170 and July 2013 reporting year to date EBITDA of $575,210.

18   CMS International, the company that provides management services to the Debtor has agreed to

19   defer its management fee of $6,000.00 per week in order to increase cash flow for the Debtor.

20   Attached hereto as Exhibit B are the Comparison of Budget to Actual for May 2013 through

21   July 2013, the Monthly Budget for May through July 2014, and a Forecasted Statement of Cash

22   Receipts and Disbursements August 2013 through July 2014 (collectively the "Budget").

23   (collectively the "Budget").  The Budget clearly shows the removal of payment of management

24   fees to CMS through July 2014.  Based on current year earnings to date, the Debtor believes that

25   the 2013 budgeted annual EBITDA of $1,012,600.00, is attainable.

26

27

28

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

ARTICLE XIV.

<u>LIQUIDATION ANALYSIS</u>

The PLAN must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 case, the general rule is that the debtor's assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

A creditor would recover from the assets of the bankruptcy estate less under Chapter 7 than under Chapter 11 for two reasons. First, the estimated market value of the Debtor' non-exempt encumbered assets under normal selling conditions, estimated at between $5,000,000 and $8,000,000 are encumbered by secured liabilities of approximately $5,900,000.00, and the value of the assets would severely decline in a forced liquidation. Further, after deducting costs incurred in having to maintain and insure the encumbered real property and to market and sell such property, along with the time for such process, any equity that exists, if any, in the property would be significantly reduced. Additionally, the unencumbered non-exempt assets are minimal and virtually unsaleable in the current market. Second, in a Chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors.

Assuming the Debtor had to pay out all of the monies outlined above, including those monies being asserted by the secured creditors, it is unlikely the Debtor would be left with any significant amounts for payment to General Unsecured Creditors and distribution to Debtor's equity holders. Thus, if there were a liquidation of assets, Debtor believes that general

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

27

unsecured creditors would not receive more on their claims than is being proposed in Debtor's Plan, due to the nature and amount of the secured claims against the Debtor's assets and the nature and value of such assets. Additionally, even if there were sufficient amounts to pay general unsecured creditors in full on liquidation, Debtor's Plan proposes payment in full with interest thereon so general unsecured claims would not receive more from a liquidation.

Assuming the Debtor had to pay out all of the monies outlined above, including those monies being asserted by the secured creditors, it is unlikely the Debtor would be left with any significant amounts for payment to General Unsecured Creditors and distribution to Debtor's equity holders. Thus, if there were a liquidation of assets, Debtor believes that general unsecured creditors would not receive more on their claims than is being proposed in Debtor's Plan, due to the nature and amount of the secured claims against the Debtor's assets and the nature and value of such assets. Additionally, even if there were sufficient amounts to pay general unsecured creditors in full on liquidation, Debtor's Plan proposes payment in full with interest thereon so general unsecured claims would not receive more from a liquidation.

ARTICLE XV.

DISCLOSURE STATEMENT

When the Debtor solicits the requisite acceptance(s) of this Plan, it will be accompanied by a Disclosure Statement that will have been approved by the Court, as may be amended, prior to such solicitation. The Debtor requests that all parties whose acceptance(s) of this Plan are solicited should direct their attention to the Disclosure Statement.

ARTICLE XVI.

CONFIRMATION REQUEST

THE HOLDER GROUP SHARKEY'S, LLC, as proponent of this Plan, requests confirmation of this Plan pursuant to 11 U.S.C. §§ 1129(a) and/or 1129(b) of the Bankruptcy Code.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

28

1  Respectfully submitted this 7th day of October, 2013.

2

3  STEPHEN R. HARRIS, ESQ.
   HARRIS LAW PRACTICE LLC

4

5  Attorneys for Debtor

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE,
LLC
6151 LAKESIDE DRIVE
SUITE 2100
RENO, NEVADA 89511

29

1

## VERIFICATION

2

3

I, HAROLD D. HOLDER, SR, Manager of THE HOLDER GROUP SHARKEY'S,
4
LLC, Debtor, declare under penalty of perjury that I have read the foregoing DEBTOR'S
5
FIRST AMENDED PLAN OF REORGANIZATION, and that the contents contained therein
6
are true and correct to the best of my knowledge, information and belief. .
7
DATED this _8th_ day of October, 2013.
8

9

10
Harold D. Holder, Sr., Manager
11
THE HOLDER GROUP SHARKEY'S, LLC,
Debtor
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# EXHIBIT "A"

B6G (Official Form 6G) (12/07)

In re: THE HOLDER GROUP SHARKEY'S, LLC _____,    Case No. 13-50844-BTB _____
                                                    Debtor                                              (If known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

☐  Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| AMERIPRIDE SERVICES, INC. 78620 WILBUR WAY SACRAMENTO, CA  95828 | 36 MONTH LEASE FOR LINEN SERVICE COMMENCED 6/9/11.  MONTHLY PAYMENT OF APPROXIMATELY $325. |
| BALLY GAMING, INC. LOCKBOX 749335 LOS ANGELES, CA 90074 | SLOT MACHINE LEASE |
| BALLY GAMING, INC. BALLY TECHNOLOGIES LOCKBOX 749335 LOS ANGELES, CA  90074 | LEASE FOR FOUR SLOT MACHINES AT $19.58/DAY.  THIS IS A 36 MONTH LEASE WITH $1 BUYOUT AT END.  THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |
| BMI 10 MUSIC SQUARE EAST NASHVILLE, TN  37203 | MUSIC LICENSE AGREEMENT FOR ONE YEAR PERIOD WITH AUTO RENEWAL SINCE 11/2007, WITH 30 DAY NOTICE REQUIRED FOR CANCELLATION.  ANNUAL FEE IS $465. |
| FRONTIER P.O. BOX 20550 ROCHESTER, NY  14602 | MONTH TO MONTH TELEPHONE SERVICE CONTRACT FOR $435.65/MONTH.  30 DAYS NOTICE REQUIRED FOR CANCELLATION. |
| IGT 9295 PROTOYPE DRIVE RENO, NV  89511 | MICROSOFT END-USE LICENSE AGREEMENT. |
| IGT P.O. BOX 887866 LOS ANGELES, CA  90088 | ROYALTY AGREEMENT FOR MULTI-HAND POKER MACHINES AT $20/DAY FOR 1 MACHINE, WITH REMAINING 6 MACHINES AT $15/DAY.  CONTRACT IS TERMINATED BY RETURN OF ALL MACHINES. |
| IGT P.O. BOX 887866 LOS ANGELES, CA  90088 | MONTH TO MONTH SLOT PARTICIPATION AGREEMENT. FEE IS 20% OF NET WIN OR $20/DAY PER MACHINE, WHICHEVER IS GREATER. THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |

∶ ¹4:44    Page 39 of 31

B6G (Official Form 6G) (12/07) -Cont.

In re:   THE HOLDER GROUP SHARKEY'S, LLC                      ,      Case No.   13-50844-BTB
                                Debtor                                                                (If known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| KONAMI GAMING<br>585 TRADE CENTER DRIVE<br>LAS VEGAS, NV  89119 | SALES & SECURITY AGREEMENT FOR SLOT ACCOUTNING & PLAYERS CLUB SYSTEM. |
| KONAMI GAMING<br>585 TRADE CENTER DRIVE<br>LAS VEGAS, NV  89119 | MONTHLY SYSTEM SUPPORT CONTRACT AT $922.25/WEEK. |
| NEVADA NOVELTY<br>2195 CHAROLAISE CIRCLE<br>SPARKS, NV 89431 | ATM, CIGARETTE MACHINE AND JUKEBOX LEASE. $1.00 COMMISSION ON ATM TRANSACTIONS, $.50 COMMISSION ON CIGARETTE SALES AND 10% COMMISSION ON JUKEBOX. |
| PAYROLL SYSTEMS OF NEVADA<br>4874 SPARKS BLVD.<br>SPARKS, NV 89436 | MONTH TO MONTH PAYROLL SERVICES CONTRACT. FEE BASED ON PAYROLL.  THIRTY DAYS NOTICE REQUIRED FOR CANCELLATION. |
| PDS GAMING CORPORATION<br>6280 ANNIE OAKLEY DRIVE<br>LAS VEGAS, NV  89120-3910 | SLOT MACHINE LEASE AGREEMENT FOR $15/DAY PER MACHINE.  6 MONTH RENEWABLE CONTRACT. |
| PDS GAMING CORPORATION<br>6280 ANNIE OAKLEY DRIVE<br>LAS VEGAS, NV  89120-3910 | SLOT MACHINE LEASE AGREEMENT AT $10 TO $15/DAY PER MACHINE DEPENDING ON GAME TYPE. |
| RADIANT SYSTEMS<br>3925 BROOKSIDE PARKWAY<br>ALPHARETTA, GA  30022 | MONTH TO MONTH SERVICE AGREEMENT ON POINT OF SALE PROGRAM WITH MONTHLY PAYMENT OF $691.74. THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |
| RENT-A-CUBE<br>P.O. BOX 397<br>MINDEN, NV  89423 | MONTH TO MONTH LEASE FOR STORAGE SPACE AT $260.00 PER MONTH.  THIRTY DAYS NOTICE REQUIRED FOR CANCELLATION. |

B6G (Official Form 6G) (12/07) -Cont.

In re:  THE HOLDER GROUP SHARKEY'S, LLC                              Case No.  13-50844-BTB
                          Debtor                                                                      (if known)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| SCHINDLER ELEVATOR CORP.<br>1419 MARKET BLVD., STE. 10<br>SACRAMENTO, CA 95834-1937 | MONTH TO MONTH ELEVATOR MAINTENANCE CONTRACT AT $272.62 PER MONTH. THIRTY DAY NOTICE REQUIRED FOR CANCELLATION. |
| STOR-ALL<br>813 SHORT COURT<br>GARDNERVILLE, NV 89460 | MONTH TO MONTH LEASE FOR STORAGE SPACE AT $396.00 PER MONTH. THIRTY DAYS NOTICE REQUIRED FOR CANCELLATION. |
| WILLIAM HILL DBA<br>C N ACQUISITIONS SUB, INC.<br>P.O. BOX 2071<br>RENO, NV 89505<br>ATTN: JEFFREY L. SIRI | SPORTSBOOK CONTRACT WHICH EXPIRES ON THE LAST DAY OF THE CALENDAR MONTH FOLLOWING NFL SUPERBOWL GAME OF 2016. FEE IS $500 PER MONTH. |

# EXHIBIT "B"

# EXHIBIT "B"

**Sharkey's**
**Comparison of Actual to Budget**
**For the Months Ended May 2013 Through August 2013**

| | Actual May-13 | Budgeted May-13 | Variance | Actual Jun-13 | Budgeted Jun-13 | Variance | Actual Jul-13 | Budgeted Jul-13 | Variance | Actual Aug-13 | Budgeted Aug-13 | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Revenues | 268,675 | 271,000 | (2,325) | 269,349 | 274,000 | (4,651) | 256,028 | 255,000 | 1,028 | 265,030 | 287,000 | (20,970) |
| **Cost of Sales** | | | | | | | | | | | | |
| Food | 33,966 | 36,070 | (2,104) | 28,573 | 36,000 | (7,427) | 34,197 | 35,000 | (803) | 36,718 | 38,000 | (1,283) |
| Bar | 8,886 | 9,543 | (657) | 10,635 | 8,050 | 2,585 | 10,737 | 8,200 | 2,537 | 10,558 | 8,800 | 1,758 |
| Total Cost of Goods Sold | 42,852 | 45,613 | (2,761) | 39,208 | 44,050 | (4,842) | 44,934 | 43,200 | 1,734 | 47,276 | 46,800 | 476 |
| Gross Profit | 225,823 | 225,387 | 436 | 230,141 | 229,950 | 191 | 211,094 | 211,800 | (706) | 218,754 | 240,200 | (21,446) |
| **Operating Expenses:** | | | | | | | | | | | | |
| Payroll expense | 106,972 | 107,100 | (128) | 98,796 | 98,949 | (153) | 104,566 | 98,571 | 5,995 | 101,650 | 99,429 | 2,221 |
| Taxes & licenses | (14,334) | 19,931 | (34,265) | 13,292 | 22,478 | (9,186) | 12,015 | 18,800 | (6,785) | 2,346 | 19,300 | (16,954) |
| Insurance | 5,995 | 4,950 | 1,045 | 3,111 | 8,250 | (5,139) | 5,263 | 6,600 | (1,337) | 4,757 | 8,250 | (3,493) |
| Utilities | 9,553 | 10,824 | (1,271) | 10,285 | 11,000 | (715) | 11,443 | 11,775 | (332) | 11,438 | 10,075 | 1,363 |
| Leasing & rental expense | 1,248 | 769 | 479 | 1,319 | 769 | 550 | 1,242 | 769 | 473 | 1,088 | 769 | 319 |
| Advertising & promotion | 2,708 | 4,166 | (1,458) | (362) | 5,000 | (5,362) | 886 | 5,000 | (4,114) | 2,986 | 7,000 | (4,014) |
| Telephone | 989 | 1,385 | (396) | 438 | 949 | (511) | 449 | 949 | (500) | 448 | 949 | (501) |
| Entertainment | 2,500 | 1,700 | 800 | 1,900 | 2,500 | (600) | 1,670 | 2,000 | (330) | 500 | 2,500 | (2,000) |
| Laundry & uniforms | 1,316 | 1,500 | (184) | 1,552 | 1,500 | 52 | 1,727 | 2,000 | (273) | 1,079 | 2,000 | (921) |
| Dues and subscriptions | 188 | 300 | (112) | 304 | 300 | 4 | (1,556) | 300 | (1,856) | 160 | 300 | (140) |
| Postage & freight | 1 | 50 | (49) | 0 | 50 | (50) | 0 | 50 | (50) | 46 | 50 | (4) |
| Repairs & maintenance | 2,589 | 3,000 | (411) | 2,706 | 3,000 | (294) | 2,761 | 3,000 | (239) | 1,763 | 3,000 | (1,237) |
| Supplies | 3,111 | 700 | 2,411 | 2,535 | 700 | 1,835 | 666 | 700 | (34) | 1,218 | 700 | 518 |
| Travel, meals & entertainment | 0 | 500 | (500) | 0 | 500 | (500) | 0 | 500 | (500) | 0 | 500 | (500) |
| Auto expense | 347 | 250 | 97 | 75 | 250 | (175) | 262 | 250 | 12 | 0 | 250 | (250) |
| Other | 3,145 | 2,186 | 959 | 2,776 | 4,050 | (1,274) | 2,601 | 3,690 | (1,089) | 5,138 | 4,600 | 538 |
| Total Operating Expenses | 126,328 | 159,311 | (32,983) | 138,727 | 160,245 | (21,518) | 143,995 | 154,955 | (10,960) | 134,617 | 159,672 | (25,056) |
| Operating Income (EBITDA) | 99,495 | 66,076 | 33,419 | 91,414 | 69,705 | 21,709 | 67,099 | 56,845 | 10,254 | 84,137 | 80,528 | 3,610 |

Sharkey's
Budgeted Profit & Loss Statement
For the Months Ended May 1, 2013 through July 31, 2014
Prepared Based upon the Accrual Basis of Accounting

| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Weeks | 5 | 4 | 5 | 4 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 4 | 5 | 4 | 5 |
| Net Revenues | 271,000 | 274,000 | 255,000 | 287,000 | 268,200 | 305,000 | 292,700 | 269,200 | 266,800 | 258,500 | 303,000 | 254,000 | 268,700 | 269,000 | 256,000 |
| | | | | | | | | | | | | | | | |
| Cost of Sales | | | | | | | | | | | | | | | |
| Food | 36,070 | 36,000 | 35,000 | 38,000 | 32,000 | 36,000 | 30,900 | 30,400 | 30,400 | 27,900 | 30,400 | 33,900 | 35,800 | 30,400 | 31,200 |
| Bar | 9,543 | 8,050 | 8,200 | 8,800 | 11,200 | 11,000 | 8,800 | 12,500 | 8,500 | 8,800 | 10,900 | 11,800 | 9,300 | 10,900 | 10,600 |
| Total Cost of Goods Sold | 45,613 | 44,050 | 43,200 | 46,800 | 43,200 | 47,000 | 39,700 | 42,900 | 38,900 | 36,700 | 41,300 | 45,700 | 45,200 | 41,300 | 41,800 |
| | | | | | | | | | | | | | | | |
| Gross Profit | 225,387 | 229,950 | 211,800 | 240,200 | 225,000 | 258,000 | 253,000 | 226,300 | 227,900 | 221,800 | 261,700 | 208,300 | 223,500 | 227,700 | 214,200 |
| | | | | | | | | | | | | | | | |
| Operating Expenses: | | | | | | | | | | | | | | | |
| Payroll expense | 107,100 | 98,949 | 98,571 | 99,429 | 87,429 | 100,343 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 96,000 | 99,000 |
| Taxes & licenses | 19,931 | 22,478 | 18,800 | 19,300 | 19,300 | 19,300 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 | 20,060 |
| Insurance | 4,950 | 8,250 | 6,600 | 8,250 | 7,719 | 7,719 | 2,295 | 2,295 | 2,295 | 5,263 | 6,531 | 5,263 | 9,651 | 5,263 | 5,263 |
| Utilities | 10,824 | 11,000 | 11,775 | 10,075 | 11,775 | 12,475 | 10,000 | 10,000 | 11,000 | 10,000 | 9,500 | 9,500 | 9,500 | 10,500 | 11,500 |
| Leasing & rental expense | 769 | 769 | 769 | 769 | 769 | 769 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 | 1,029 |
| Advertising & promotion | 4,156 | 5,000 | 5,000 | 7,000 | 3,500 | 7,000 | 2,500 | 2,000 | 2,500 | 1,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 |
| Telephone | 1,385 | 949 | 949 | 949 | 949 | 949 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 |
| Entertainment | 1,700 | 2,500 | 2,000 | 2,500 | 2,000 | 2,500 | 1,000 | 2,000 | 2,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 |
| Laundry & uniforms | 1,500 | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 | 1,578 |
| Dues and subscriptions | 300 | 300 | 300 | 300 | 300 | 300 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Postage & freight | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Repairs & maintenance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 2,981 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Supplies | 700 | 700 | 700 | 700 | 700 | 700 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 | 1,550 |
| Travel, meals & entertainment | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Auto expense | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Other | 2,186 | 4,050 | 3,690 | 4,600 | 4,920 | 4,650 | 4,600 | 4,600 | 4,600 | 1,600 | 4,600 | 4,600 | 4,600 | 3,481 | 4,600 |
| | | | | | | | | | | | | | | | |
| Total Operating Expenses | 159,311 | 160,245 | 154,955 | 159,672 | 145,161 | 162,505 | 148,612 | 149,112 | 151,112 | 148,051 | 152,848 | 151,580 | 155,968 | 148,461 | 154,580 |
| | | | | | | | | | | | | | | | |
| Operating Income (EBITDA) | 66,076 | 69,705 | 56,845 | 80,528 | 79,839 | 95,495 | 104,388 | 77,188 | 76,788 | 73,739 | 108,852 | 56,720 | 67,532 | 79,239 | 59,620 |

**Owner's Adjustments to Arrive at EBITDA:**

| | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Depreciation | 13,769 | 13,769 | 13,769 | 13,769 | 13,769 | 13,769 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 | 14,190 |
| Interest[1] | 31,519 | 31,811 | 31,448 | 31,798 | 31,701 | 31,341 | 28,174 | 28,142 | 28,110 | 28,079 | 28,047 | 28,014 | 27,982 | 27,950 | 27,917 |
| Amortization | 5,167 | 5,167 | 5,167 | 5,167 | 1,925 | 1,925 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 | 10,651 |
| Slot participation/splits | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 | 11,974 |
| Corporate management fees | 12,000 | 24,000 | 30,000 | 24,000 | 3,000 | - | - | - | - | - | - | - | - | - | - |
| Non-recurring fees[2] | 16,657 | 16,667 | 16,667 | 21,542 | 16,666 | 21,541 | - | - | 4,875 | - | - | 4,875 | - | - | 4,875 |
| Excess Employee Benefits[3] | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 | 3,627 |

[1] All loan payments are based upon the Cash Collateral Motion through October 2013. In Nov 2013 loans restructured to 5.25% interest with 30 YR term and various amortization years included in these amounts.

[2] Bankruptcy legal fees & US Trustee Payments.

[3] Employee meals.

Statement of Cash Receipts Disbursements
For the Months August 2013 Through July 2014

| FORECAST | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Cash Receipts**
Real/Lease Collected
Cash Received from Sales
Interest Received
Borrowings
Funds from Shareholders
Funds or Other Curators
Capital Contributions

**Total Cash Receipts**

**Cash Disbursements**
Payments for Inventory
Selling
Administrative & US Trustee
Capital Expenditures
Principal Payments to Debt
Interest Paid
Rent/Lease:
  Personal Property
  Real Property
Amount Paid to
Owner(s)/Officer(s)
Salaries
Draws
Commission/Royalties
Expense Reimbursements
Other
Salaries/Commissions (less
employee withholding)
Management Fees
Taxes:
  Employee Withholding
  Employer Payroll Taxes
  Real Property Taxes
  Other Taxes
Other Cash Outflows:
  Other Operating Expenses

**Total Cash Disbursements**

Net Increase/(Decrease) in Cash

Cash Balance, Beginning of Period

Cash Balance, End of Period